Eiley S. JORDAN, Jr., Donnell Reed, and Tyrone N. Walker, Appellants,

v.

UNITED STATES, Appellee.

No. 95–CF–1279, 95–CF–1343, 96–CF–31, 97–CO–747.

District of Columbia Court of Appeals.

Argued Oct. 28, 1998.

Decided Dec. 30, 1998.

Gary M. Sidell, Washington, DC, for appellant Jordan.

Allen H. Orenberg, Wahington, DC, for appellant Reed.

Joseph Virgilio for appellant Walker.

Megan E. Hills, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary Patrice Brown, and P. Kevin Carwile, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and GREENE, Associate Judge of the Superior Court of the District of Columbia.*

FARRELL, Associate Judge.

Appellants were each found guilty of first-degree murder arising from the shooting death of Arminita Coates, assault with intent to kill while armed arising from the shooting of Michael Johnson, and related offenses including conspiracy. The government's evidence reasonably permitted a conclusion by the jury that appellants, acting in concert, shot Johnson and Coates (Johnson's girl-friend) in retaliation for Johnson's having shot and killed Carlos Jordan the night before. Carlos Jordan was appellant Eiley Jordan's brother.

Appellants raise a variety of issues on appeal, only one of which requires extended discussion.[1] Appellants Jordan and Reed

---

* Judge Henry F. Greene was designated as part of this division pursuant to D.C.Code § 11–707(a) (1995).

1. As to the other issues: There was sufficient evidence to support each defendant's convictions. The argument that Richard Jackson's testimony was "inherently incredible" is unpersuasive, see In re A.H.B., 491 A.2d 490, 496 n. 8 (D.C.1985), as is the claim that Nicole Dinkins' testimony was "inherently unreliable" and her pretrial identification inadmissible under In re L.D.O., 400 A.2d 1055 (D.C.1979). See Paris v.

United States, 515 A.2d 199, 205 (D.C.1986). The trial judge did not abuse his discretion in denying appellant Jordan's request for severance based on disparity of the evidence, or in denying without a hearing appellant Reed's motion for a new trial based on an exculpatory affidavit of Michael Johnson which the judge properly found did not meet the requirements of a declaration against penal interest. See Harris v. United States, 668 A.2d 839, 843 (D.C.1995). Finally, the judge properly rejected Reed's claim of violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and—with one

contend that the trial judge erroneously refused to let them (1) question the witness Anthony Hunter to attempt to establish facts suggesting that Hunter and not Reed had been one of the shooters; and (2) argue Hunter's culpability to the jury. Applying the test of *Winfield v. United States*, 676 A.2d 1 (D.C.1996) (en banc) (*Winfield II* ), we agree that the judge unduly limited exploration and argument of Hunter's potential complicity in place of Reed. We also hold, however, that the error was not prejudicial enough to warrant reversal because there is no realistic possibility that the prohibited line of inquiry and argument would have changed the verdict.

## I.

Three eyewitnesses identified Reed as one of two gunmen (Reed and Walker) who entered a house in Southeast Washington on the morning of June 10, 1992, and shot Coates and Johnson. Reed entered first, according to two of the eyewitnesses, and in reply to a question by Coates gave his name as "Tony" and asked if Mike (Johnson) was there. Coates went upstairs to get Johnson, followed by Reed. Seconds later Reed shot Johnson. Gregory Cooley, who was upstairs at the time, ran downstairs to get Coates's son and take refuge with him in the bathroom, where he joined Lillian Cooley (Gregory's sister) and Nicole Dinkins. All three heard additional shots. When Dinkins left the bathroom and peeked out into the front room, she saw a second man, Walker, "fooling" with a handgun. Minutes later Coates's body was found on the floor between the dining room and a bedroom; she had been shot multiple times.[2] Johnson survived his wounds,[3] but Coates did not.

A fourth government witness testified to the antecedent events. Richard Jackson stated that late in the night of June 9, 1992,

Carlos Jordan and Michael Johnson had been fighting. After Jordan hit Johnson with a bottle, Johnson retrieved a gun and began chasing Jordan while firing at him. Jordan was later found shot to death. The next morning Reed, Walker and Eiley Jordan asked Jackson where Johnson was staying, then ushered him into a car to lead them there. When they arrived in the vicinity of Coates's house, Reed and Walker left the car while Jordan, who had been driving, stayed in the car. Jackson left the area on foot. On the way to the house Reed had stated, "[I]f it was me that got shot, Carlos would have went for me so that's why I'm going."

Neither the Cooleys nor Dinkins had known Reed before. Nevertheless, all three identified Reed from photographs or a lineup, or both, as the man who had identified himself as "Tony" and had gone upstairs looking for Johnson. In addition Dinkins, although not asked initially to make an in-court identification, approached an FBI agent after her testimony and told him that she recognized both Reed and Walker at trial as the intruders in the house. She was recalled to the stand and identified both men as the shooters.

## II.

Anthony Hunter was called as a witness by Reed and was questioned by appellant Jordan as well. He admitted that he was nicknamed "Tony" and was a friend of Carlos Jordan. Hunter had been "on the streets" one night in June 1992 (he could not remember the date) "when an individual was firing a weapon at Carlos," though he said he could not identify the shooter since he had been on drugs at the time. Hunter also knew Michael Johnson and admitted that he had been "protecting Carlos Jordan from Michael Johnson."[4] Appellant Jordan's counsel

---

possible exception to be noted at the end of this opinion—did not err in refusing a hearing on Walker's *pro se* claims of ineffective assistance of counsel raised by post-conviction motion.

2. Ballistics evidence showed that the victims had been shot with at least two different handguns.

3. Johnson refused to testify at trial even though granted use immunity.

4. Q. . . . Was there a time on June 9th and June 10th of 1992 where you were protecting Carlos Jordan from Michael Johnson?

    A. I don't remember what time frame . . . .
    Q. Well, were you protecting Carlos Jordan from Michael Johnson?
    A. Yes.
    Q. And Michael Johnson was shooting at Carlos Jordan?

asked Hunter if he remembered "going to look for Michael Johnson in mid 1992." When Hunter answered "no" counsel asked if he recalled testifying before a grand jury in October 1993. Hunter answered "no" and the prosecutor objected to further questioning along this line. Asked for a proffer of the relevance of the grand jury testimony, counsel stated:

> There were questions [at trial] about this witness being out and seeing someone shooting at Carlos Jordan [on] June 9th, 1992.... And the grand jury testimony of this person which occurred October 1, 1993, well, he is ... no longer under the influence of PCP[,] that he went looking, this witness went looking for Michael Johnson that night in connection with the incident.

The judge inquired, "He went looking for Michael Johnson?", to which counsel replied, apparently quoting from the grand jury testimony: "I [Hunter] found out because we went looking for him, referring to Michael Johnson, and we didn't find him." Counsel again proffered that Hunter, "in his grand jury a year and a half after his [sic] events[,] said he went looking for Michael Johnson after he sees Michael Johnson going to shoot or shoot[ing] at Carlos Jordan." The judge asked, "Where does he say he went to look for him, the next day, that very night?", and counsel responded, "That night was the ... time period of the statement which I read to the Court, his grand jury testimony, when they found the body of Carlos Jordan and he identifies Michael [Johnson] by name."

Counsel for Eiley Jordan requested leave to question Hunter further to establish that, having failed to "protect" Carlos Jordan from Michael Johnson that night, he indeed "went looking" for Johnson after the shooting. Reed and Jordan argued that such questioning, combined with the fact that the first gunman to enter the house had called himself "Tony" and that Hunter's physical description was not inconsistent with the general eyewitness description given of the first intruder, would provide a legitimate basis for arguing to the jury that Hunter and not Reed was that gunman. The trial judge, however, found these facts and the grand jury proffer insufficient to allow counsel to "go[ ] any further with this line of cross-examination" or to argue Hunter's complicity to the jury.[5] The judge explained:

> [T]he Court doesn't believe that the proffer so far at this point reaches the evidentiary threshold to *clearly* connect Mr. Hunter to the offense.
>
> What we have is a very weak motive, if any, the only motive being a friendship perhaps with Mr. Jordan but many people had a friendship with Mr. Jordan. The fact that for some unknown reason on the scene [Hunter] may have looked for Mr. Johnson and why he may have done that is unclear, maybe to see—maybe to help Mr. Johnson, maybe to help Mr. Jordan, we don't know.
>
> The fact that he gave a nickname Tony really is not very helpful in terms of a *reasonable possibility* he may have committed the offense because I think it's fairly unlikely that a person would identify himself by his own name, his own nickname, if he were the actual shooter. And that I don't believe—a description that was attributed to witnesses on the scene is so general I don't think it really—it could fit a lot of people and I don't think it would tend to suggest that Mr. Hunter was involved in this offense.
>
> There's no evidence that he ... was anywhere near the scene at the time, that he had access to any weapon at or about the time of the offense, that he lived ... in the immediate area where the shooting took place or would have been there at about the time the shooting took place.
>
> So I think at this time on this record the Court finds the probative value of the evidence is weak and the resulting tendency

A. I said I don't remember what went on that night as I was under the influence of drugs.

Q. But you do remember that you were protecting Mr. Jordan, Carlos Jordan, from Michael Johnson?

A. I said yes to that ....

5. "You can say Tony is the killer ... [b]ut ... you can't argue ... that Tony was Mr. Hunter."

of the evidence [is] to mislead and distract the jury from its ultimate function in this case to determine whether or not the Government's evidence proves beyond a reasonable doubt the identity of these two people [*i.e.*, the shooters]. [Emphases added.]

### III.

The present case was tried before the decision in *Winfield II, supra,* where this court attempted to clarify the law concerning admissibility of third-party perpetrator evidence. We concluded that such evidence is governed by the normal standard of relevance, *i.e .,* it is admissible if it "tend[s] to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Id.* at 5 (quoting *Johnson v. United States,* 552 A.2d 513, 516 (D.C.1989)) (emphasis and internal quotation marks omitted).[6] Appellants Reed and Jordan point out that at times in the discussion below the trial judge appeared to apply the more restrictive standard of admissibility (the so-called "clearly linked" doctrine) rejected in *Winfield II.*[7] On the other hand, the judge on three occasions framed the issue as whether the defense had shown or proffered "a reasonable possibility" that Hunter and not Reed was the first intruder—the *Winfield II* test.[8] What is certain is that the judge did not have the benefit of our full discussion of the issue in *Winfield II,*

including our direction that "the trial court must resolve close questions of admissibility in this setting in favor of inclusion, not exclusion." *Id.* at 6; *see also id.* at 7 (the evidence is admissible "so long as the balancing of probative value versus prejudice does not clearly favor exclusion"). For this reason, appellants suggested at oral argument that the proper course might be to remand the record to the trial judge for reconsideration of the issue *post hoc* in light of *Winfield II.* We conclude that that course is unnecessary for two reasons. First, on the record evidence and proffer regarding Hunter, we are convinced that it would have been error for the judge to preclude the requested line of inquiry under *Winfield II* and its admonition about close cases. *See Wright v. United States,* 508 A.2d 915, 920 (D.C.1986) (remand for discretionary decision unnecessary where trial court "actually had 'but one option' " (citation omitted)).[9] Second, we are convinced nonetheless that allowing that questioning—and allowing the defense to argue in closing that Hunter was the "Tony" at the house—would not have created a realistic possibility of a different outcome to the case.

### A.

■ In *Winfield II,* we stated that, the focus of the test for admissibility "is not on the third party's guilt or innocence, but on 'the effect the evidence has upon the defen-

6. We stated further that, as with any evidence, the judge must balance the probative value of the proffered evidence against the risk of undue prejudice, meaning in this context that the judge "will have discretion to exclude marginally relevant evidence creating the danger that proof of prior dealings or hostility between the victim and third persons will distract the jury from the issue in this case." *Winfield II,* 676 A.2d at 5.

7. Evidently referring to the panel decision in *Winfield* which was then pending on a petitioner for rehearing en banc (*see Winfield v. United States,* 652 A.2d 608 (D.C.1994), *vacated,* 661 A.2d 1094 (D.C.1995) (*Winfield I*)), the trial judge stated at one point: "[I]t said that you had to have a reasonable probability, not possibility, that someone other than the accused committed the offense." And, in a sentence we have quoted earlier, the judge stated that he did not "believe that the proffer so far ... reaches the evidentiary threshold to *clearly* connect Mr. Hunter to the offense" (emphasis added).

8. Moreover, the judge cited the *Johnson* decision which set forth the standard we adopted en banc in *Winfield II.*

9. The government does not argue that *Winfield II* should not be applied retroactively to this case. Although panels of this court have reserved on that issue, *see Wilson v. United States,* 711 A.2d 75, 78 (D.C.1998); *Gethers v. United States,* 684 A.2d 1266, 1271 (D.C.1996), it would be a hard argument to make that the decision should not apply to cases such as this that were pending on appeal at the time *Winfield II* was decided. *See Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *see also Winfield II,* 676 A.2d at 6–7 (noting that "a substantial proffer that a third person committed the offense implicates the defendant's constitutional right to 'a meaningful opportunity to present a complete defense' " (citation omitted)).

dant's culpability,' and in this regard it 'need only *tend* to create a reasonable doubt that the defendant committed the offense.' " *Id.* at 4 (quoting *Johnson*, 552 A.2d at 517 (emphasis in *Johnson* )). We agree with the government that the fact alone that Hunter and not Reed was nicknamed Tony had no such exculpatory tendency; that name is a common one and, indeed, Antonio ("Tony") Howard was also linked by testimony to the events in question. See note 15, *infra.*[10] The plot thickens, however, with the addition of the facts, supported by testimony and reasonable inferences therefrom, that Hunter had been out on the street "protecting" his friend Carlos Jordan from Michael Johnson and saw Johnson shoot at and possibly kill Jordan. Still more, relying on Hunter's grand jury testimony, Reed and Walker proffered that Hunter not only had a motive to avenge Jordan's shooting but acted upon that motive when he "went looking for" Johnson after the shooting.

The government asserts that the proffered testimony was vague, echoing the trial judge's point that Hunter went looking for Johnson "for some unknown reason" or that why he did so was "unclear." Again, however, see note 10, *supra,* this mistakes admissibility for the weight of the evidence; seeing the friend he was "protecting" shot by Johnson supports a permissible inference that Hunter went looking for Johnson to retaliate. The trial judge was also troubled that no other evidence placed Hunter at or near the scene of the Johnson/Coates shootings. But we have said that the proffered "opportunity to commit the crime" need only be a "practical" one, "including at least inferential knowledge of the victim's whereabouts." *Winfield II,* 676 A.2d at 5. Hunter claimed to be a friend of Johnson and, according to the government's proof, was the person who first alerted the police that Richard Jackson knew something about the shootings—the same Jackson who had led the assailants to Johnson's house. So a conclusion that Hunter knew where Johnson could likely be found would not be mere speculation. Finally, at oral argument the government pointed to appellants' failure to make Hunter's grand jury testimony part of the record, thus leaving this court unable to confirm the accuracy of the proffer. But the trial prosecutor, who had Hunter's grand jury testimony in his possession,[11] did not dispute the accuracy of defense counsel's representation; the government does not question it now; and the trial judge assumed its truth.

On the basis of the grand jury proffer and the testimony already heard regarding Hunter, the defense should have been allowed (1) to question Hunter further to attempt to secure his adoption of the grand jury statement,[12] and (2), on that combined basis, to argue to the jury that Hunter and not Reed was the "Tony" who entered the victims' house.

**B.**

█ Nevertheless, although the judge should have allowed further questioning of Hunter about his possible complicity, we are convinced that the judge's failure to do so— and his refusal to allow appellants to argue that Hunter was the intruder "Tony"—were not consequential enough to require reversal. The primary beneficiary of the theory, of course, would have been Reed, whom the eyewitnesses had identified as the intruder calling himself "Tony." But the evidence against Reed was compelling. Richard Jackson's testimony, which placed Reed at the scene and quoted Reed's statement as to why he was looking for Johnson,[13] was confirmed by the eyewitness identifications of Gregory

---

**10.** On the other hand, the unlikelihood that an intruder intent on killing would reveal his actual nickname seems to us to go not to admissibility, as the trial judge thought it did, but to the weight of the evidence.

**11.** He offered it as the good faith basis for certain questions in cross-examining the next witness, Reed.

**12.** Whether, under then-prevailing law, the statement would have been admissible substantively without adoption of it by Hunter need not be decided in view of our ultimate disposition of the case. *But see Johnson v. United States,* 387 A.2d 1084, 1085–86 n. 1 (D.C.1978) (en banc); D.C.Code § 14–102(b) (1995) (prior inconsistent statements under oath).

**13.** "[I]f it was me that got shot, Carlos would have went for me so that's why I'm going."

Cooley, Lillian Cooley, and Nicole Dinkins. Gregory identified Reed from both photographs and a lineup, Lillian from photographs. Dinkins too made a lineup identification, and although not initially asked to make an in-court identification, she sought out an FBI agent after her testimony and told him she had recognized the intruders in court—Reed from having talked to him at the door of the house. She then identified the intruders in court. Crediting the "Hunter–for–Reed" theory, in short, would have required the jury to disbelieve central portions of the testimony of all four of these witnesses, besides accepting the unlikely hypothesis that an intruder intent on murder had announced his real nickname. Additionally, of the proffered evidence supporting the defense theory, the single piece not before the jury was the fact that Hunter had gone looking for Johnson.[14] Thus, a jury willing to accept the fact that "Tony" was the intruder's actual name already had evidence—specifically of motive—with which to fill in the blanks of Reed's argument that someone else shot Johnson.[15]

In sum, there is no realistic possibility that the verdict would have been different[16] had the defense been allowed to pursue further the theory of Hunter's culpability. *See* *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ We add one further observation. The *Winfield* issue was not raised at all until Hunter testified in the defense case, and it plainly caught the trial judge unaware ("So where are you headed with this grand jury testimony?"). In *Winfield II* we explained that, "[a]s with admissibility questions under *Drew v. United States,* [118 U.S.App. D.C. 11, 331 F.2d 85 (1964) ], the issue of whether third-party perpetrator evidence will be admitted should normally be resolved as a preliminary matter before trial .... " *Winfield*

*II,* 676 A.2d at 6 n. 6. We repeat that injunction here. The trial court's discretion in this area certainly includes the authority to require disclosure of a prospective *Winfield* defense in time to permit a ruling on it, at least provisionally, before trial begins.

### IV.

The government concedes that the case must be remanded for the trial court to effect a merger of some of appellants convictions. The parties disagree, however, on which convictions merge. We leave that for the judge to determine on remand. *See, e.g., Harling v. United States,* 460 A.2d 571, 574 (D.C. 1983). In the process, the judge should consider, perhaps on separate motion filed under Super. Ct.Crim. R. 35(a), the claim adverted to by Walker in his *pro se* motion alleging ineffective assistance of counsel, see note 1, *supra,* that his mandatory 30–year minimum prison sentence for first-degree murder ran afoul of the prohibition against *ex post facto* punishment (a claim, we note, that is also available to appellant Jordan).

Accordingly, we remand the case for partial resentencing. In all other respects, the judgments of conviction are affirmed.

***So ordered.***

---

**14.** More precisely, Hunter's proffered grand jury statement was that "we went looking for [Michael Johnson], and we didn't find him ." Allowed to question Hunter further, one assumes, Reed's attorney would have sought to discount the latter assertion as self-serving.

**15.** Appellants were free to argue that yet another "Tony" might have been the first intruder. Defense witness William Coleman testified that he

saw two men running from the Johnson house after hearing gunshots, and the parties stipulated at trial that Coleman identified one of these men as Antonio Howard, also known as "Tony."

**16.** We reach that conclusion not just as to Reed but as to Jordan, the only other defendant to raise the issue.