**Nathaniel RESPER, Jr., Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Nos. 97–CF–426, 99–CO–1655.**

District of Columbia Court of Appeals.

Argued June 19, 2001.

Decided March 14, 2002.

Licha M. Nyiendo, appointed by the court, with whom Jeffrey T. Green, Washington, DC, was on the brief, for appellant.

Marc O. Litt, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, John R. Fisher, Elizabeth Trosman, and William M. Sullivan, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and REID, Associate Judges.

REID, Associate Judge.

Nathaniel Resper, Jr. was indicted for the shooting death of Everett Turner on March 12, 1994, in violation of D.C.Code §§ 22–2401, –3202 (1996). A jury found him guilty of the lesser included crime of second-degree murder while armed; possession of a firearm during the commission of a crime of violence, in violation of D.C.Code § 22–3204(b); and carrying a pistol without a license, in violation of D.C.Code § 22–3204(a).[1]

On appeal, Mr. Resper contends that the trial court committed reversible error in two of its rulings.[2] First, he argues that the trial court violated his Fourth and Fifth Amendment constitutional rights by refusing to suppress statements that he made during a police interview on March 15, 1994, three days after the shooting. Second, he maintains that the trial court violated his constitutionally protected right to present a complete defense when it refused to allow him to present evidence that other persons had a motive to commit the murder with which he was charged. Detecting no violation of the Fourth and Fifth Amendments since the police made a permissible *Terry*[3] stop of Mr. Resper and he was neither in custody nor interrogated on the day of the stop; and further, discerning no error in the exclusion of evidence regarding the motives of others to murder Mr. Turner, we affirm.[4]

**FACTUAL SUMMARY**

The government's evidence and the trial court's findings show that on March 12, 1994, at about 12:20 p.m., Mr. Turner was in the front passenger seat of a Ford Taurus station wagon driven by Ms. Kisha Harley, the mother of his two children.

---

1. Mr. Resper was sentenced to a term of fifteen years to life on the murder charge, five to fifteen for the firearm possession (to run consecutively with the murder sentence), and one to three years for carrying a pistol without a license (to run concurrently with the other sentences).

2. Although an appeal was filed from the denial of Mr. Resper's new trial motion, he did not contest that ruling either in his brief or at oral argument. Therefore, we do not consider the denial of the new trial motion in this opinion.

3. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

4. Following oral argument in this case, we remanded the record to the trial court in June 2001 for a fuller statement of the factual findings on which it based its denial of the suppression motion. We received those findings in September 2001. Neither party filed a supplemental brief in response to the trial court's augmented findings and conclusions.

The car had stopped for a red light at Fifth Street and Rhode Island Avenue in the Northeast quadrant of the District of Columbia. Suddenly, a man ran up to the passenger side window and shot nine bullets into Mr. Turner's body. Ms. Harley saw the shooter's torso, but was unable to see his face from her vantage point. The shooter fled. Ms. Harley immediately drove the car to Providence Hospital, where Mr. Turner was pronounced dead.

On the same day of Mr. Turner's murder, a man drove into the parking lot of a nearby fire station where gunshots had been heard moments earlier. The motorist explained to two firemen that he had just witnessed a shooting. He described a blue '82 Oldsmobile Cutlass and gave a license tag number, 650–646, which one of the firemen wrote down. The firemen did not obtain the motorist's name or any other information, and the motorist left quickly. Also on the same day, an unidentified person called 911 at 12:28 p.m. and said that he had witnessed someone getting out of a '77 blue or black Monte Carlo and firing shots into a Taurus station wagon. A partial license number was given which was consistent with that recorded by the fireman. Based on the information provided by these two individuals and subsequent investigation, the police determined that the license number belonged to a '82 Pontiac Grand Prix registered to Mr. Resper.[5]

Three days after Mr. Turner's murder, a United States Park Police officer saw the car bearing the license number 650–646. Park Police notified Detective Pamela M. Reed of the Metropolitan Police Department who had been assigned as the lead detective in the investigation of Mr. Turner's murder; and they also staked out the car. Near the scene were approximately four police cruisers and two unmarked police vehicles. Detective Reed was in one of the unmarked vehicles, about two blocks away from Mr. Resper's vehicle. When police officers saw Mr. Resper approach the car and drive it away, they stopped it "a short distance from where it had been parked." In addition to Mr. Resper, the car was occupied by Mr. Eli Alexander. "With their weapons drawn, the officers directed the two individuals to step out of the vehicle." Both men acquiesced, and "were patted down for weapons."

Detective Reed testified that she was not present when the stop took place, but she arrived "almost immediately" thereafter. Including Detective Reed's, "at least four or five" police cars—"there could have been one or two more"—participated in the stop of Mr. Resper's car. She "saw Mr. Resper standing next to a U.S. Park Police officer near a marked police car." Mr. Resper had been frisked for weapons, but he was not handcuffed when she arrived, nor was he handcuffed at any point afterwards, to her knowledge. Detective Reed told Mr. Resper that his car was being impounded because of the reports that it had been involved in Mr. Turner's murder. She requested that he accompany her to the police station for questioning. She explained her desire to speak with him concerning "information she had that linked his vehicle to a crime, and that he was not under arrest."[6] Furthermore, "[s]he said that she was interested in tracing the movements of his car on that date and was interested in whatever information Mr. Resper could provide in that re-

5. There was testimony at trial that the three cars—Monte Carlo, Oldsmobile Cutlass, and Pontiac Grand Prix—have similar body types and size, so the descriptions were not inconsistent.

6. A warrant for Mr. Resper's arrest in connection with Mr. Turner's murder was not issued until July 5, 1994.

gard." He agreed to speak with Detective Reed, as did Mr. Alexander. When asked on cross-examination whether Mr. Resper was then a suspect, Detective Reed explained: "Well, I would have to say that I would suspect anybody in the car. But, then until I asked them who had the car, [how] do I know that it was not a friend? I don't know who has the car until I ask them." On redirect, she explained: "I should put it this way. The car was a suspect."

According to the trial court's factual findings on remand, Detective Reed told Mr. Resper "that the police would seize his car ....," and that both men would be transported to her office in different cars. "She instructed the transporting officer that Mr. Resper was not under arrest and that he was not to be handcuffed."

After their arrival at her office, Detective Reed questioned the men separately. She told Mr. Resper that his car had been seen at the site of "the shooting of Everick (sic) 'DJ' Turner." Mr. Resper said "that he knew 'DJ' and that he had heard that some person shot 'DJ' but denied that he was involved in the shooting." Mr. Resper provided the name of an alibi witness.

Mr. Resper's account of his stop on March 15th was at odds with that of Detective Reed. He testified that there were two or three police cars behind his car, two on each side of the intersection, a tow truck and a helicopter flying above with a flashing light. Armed police officers ordered him to get out of his car, placed him on the ground with his face down, put handcuffs on him and searched his person. When Detective Reed asked whether he would speak with her at her office, he said he could not do it at that time. He requested her business card and telephone number, telling her he would "get back" to her. Detective Reed said she would find something on which to arrest him. Still in handcuffs, he was transported to the police station and handcuffed to a desk. He was at the station for three or four hours, and could not leave. At the time, he was represented by an attorney in another pending case. He advised Detective Reed that he had his attorney's business card in his pocket, but was not allowed to call him. Mr. Resper said that he had been with a woman at the Motel 8 on New York Avenue, not far from the crime scene, on the morning of March 12th. They left the motel at about 12:30 p.m., picked up Mr. Alexander, and drove to the nearby Wendy's for lunch. Then they drove to the woman's apartment, where Mr. Resper stayed for the rest of the afternoon; his car was parked outside of her apartment.[7] During his questioning by Detective Reed, Mr. Resper declined to give a written statement, but agreed to be photographed.

Prior to trial, Mr. Resper moved to suppress the statements that he made during his questioning by Detective Reed. After hearing the matter, the trial judge credited Detective Reed's testimony, saying that "her demeanor on the witness stand caused the court to conclude that she was a credible witness." However, the court declared that Mr. Resper "was not, for the

7. At trial, the prosecution noted the discrepancies between Mr. Resper's account and that of others. While Mr. Resper was at the station on March 15th, Mr. Alexander was also being questioned by Detective Reed. Mr. Alexander told a similar but not identical story. He could not say for sure whether they had gone to Wendy's. In addition, he insisted that he, not Mr. Resper, kept Mr. Resper's car for the rest of the afternoon after Mr. Resper and the woman returned to her apartment. At trial, the woman testified that she had not gone to Wendy's. Rather, Mr. Resper and Mr. Alexander had dropped her off at her apartment alone after they left the motel. She further testified that Mr. Resper had later asked her to be an alibi for him.

most part, a credible witness." The judge added, "this court did not and does not credit his testimony at any point where it was at variance with that of Detective Reed on any material issue."

In denying Mr. Resper's motion to suppress, the trial judge found that Mr. Resper and Mr. Alexander were at Detective Reed's office for less than one hour. Mr. Resper was not handcuffed, never asked that the interview be stopped, never requested a lawyer, and "was free to refuse to participate in the interview or to terminate the interview at any time." In addition, the trial court found that "both men departed Detective Reed's office" after the interview. Mr. Resper had had previous contact with the criminal justice system and had been informed of his *Miranda* rights on those occasions.[8]

The trial court also concluded that Mr. Resper "was not unlawfully seized at the time of the initial stop," and that "[t]he seizure of the vehicle and its occupants was reasonable, brief, minimally intrusive and, therefore, lawful." Furthermore, the trial court found:

> Mr. Resper was not in custody at any time between the initial stop and his departure from Detective Reed's office. There was no formal arrest nor restraint on freedom of movement of the degree associated with a formal arrest. . . .

> Mr. Resper was not interrogated at any time between the time of the initial stop and his arrival at Detective Reed's office.

> Mr. Resper was interrogated at Detective Reed's office. All of Mr. Resper's statements there were made voluntarily and were not the product of coercion, threats or intimidation. Mr. Resper voluntarily agreed to be interviewed by Detective Reed at her office on March 15, 1994.

. The circumstances of the interrogation, Mr. Resper's age and prior experience with the criminal justice system, and Mr. Resper's responses all indicate that the statements that he made were voluntarily made and were not the result of police overreaching, coercion, threats or intimidation.

## ANALYSIS

We turn first to Mr. Resper's argument that his Fifth Amendment rights were violated because he was placed in custody and interrogated on March 15th, without being given his *Miranda*[9] warnings. He takes the position that under the totality of the circumstances—the police display of weapons, the helicopter flying above, the frisk and handcuffs, and the incommunicado interrogation—he was not free to leave. The government contends that *Miranda* warnings were not required because Mr. Resper voluntarily agreed to participate in a non-custodial interview, fully realizing that he was not under arrest at that time.

As the Supreme Court held in *Miranda, supra,* and reaffirmed in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), a suspect must be given certain warnings prior to custodial interrogation so as to preserve his Fifth Amendment right against self-incrimination. The Court has explained that "custodial police interrogation, by its very nature, isolates and pressures the individual, . . . [and] '[e]ven without em-

---

8. He was convicted of a Bail Reform Act violation in 1990, transporting a firearm across State lines in 1992, and carrying a pistol without a license in 1993. At the time of his 1994 questioning in this matter, he was almost 23 years of age.

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ploying brutality, the 'third degree' or [other] specific stratagems, ... custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals.'" *Dickerson, supra,* 530 U.S. at 435, 120 S.Ct. 2326 (quoting *Miranda, supra,* 384 U.S. at 455, 86 S.Ct. 1602) (first alteration added). Accordingly, ever since the *Miranda* decision was handed down, the police have been required to first inform a suspect in custody that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda, supra,* note 9, 384 U.S. at 479, 86 S.Ct. 1602. If these warnings are not given, any statements given by the suspect may be deemed inadmissible in evidence against him, regardless of whether they were given voluntarily. *Dickerson, supra,* 530 U.S. at 443–44, 120 S.Ct. 2326.

The *Miranda* requirements are only applicable, however, when a suspect is in custody. *See Jones v. United States,* 779 A.2d 277, 280 (D.C.2001) (en banc). Custody "is imposed once the investigating officer physically deprives the suspect of his freedom of action in any significant way or, under the circumstances, leads him to believe, as a reasonable person, that he is so deprived." *Miley v. United States,* 477 A.2d 720, 722 (D.C.1984) (citations omitted). More specifically, custody is recognized when "there [is] a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam) (citations and internal quotation marks omitted). This is an objective test, determined by "how a reasonable [person] in the suspect's position would have under-

stood [his or her] situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (footnote omitted). A court examines the "totality of the circumstances," and its evaluation must be "informed by the underlying purpose of the *Miranda* rule, namely to protect individuals from compelled self-incrimination." *United States v. Turner,* 761 A.2d 845, 851 (D.C.2000) (quoting *Sprosty v. Buchler,* 79 F.3d 635, 640 (7th Cir.) (citation omitted), *cert. denied,* 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 95 (1996)).

On appeal from the trial court's denial of a suppression motion on *Miranda* grounds, "our role is to ensure that the trial court had a substantial basis for concluding that no [constitutional] violation occurred." *McIntyre v. United States,* 634 A.2d 940, 943 (D.C.1993) (citations omitted) (alteration in original). We review the trial court's underlying factual findings deferentially, and we will not set them aside unless they are clearly erroneous, that is, unless they lack substantial support in the record. *Morris v. United States,* 728 A.2d 1210, 1215 (D.C.1999) (citations omitted). We review *de novo* the trial court's legal conclusions as to whether the defendant was in custody and whether the facts established a *Miranda* violation. *Id.* In making these determinations, we view the record in the light most favorable to the party that prevailed in the trial court, and will sustain any reasonable inference that the trial judge has drawn from the evidence. *Id.* (referencing *Peay v. United States,* 597 A.2d 1318, 1320 (D.C. 1991) (en banc)).

We do not discern here any basis for disturbing the trial court's factual findings or its ultimate conclusion that Mr. Resper was not in custody. We recognize the marked discrepancies between the defendant's description of the March 15th stop and interview and Detective Reed's.

However, those discrepancies have been addressed by the trial court's findings of fact and credibility determinations. It is clearly within the province of the trial court to make the credibility determinations needed to resolve conflicts in witnesses' testimony. *See, e.g., Payne v. United States,* 516 A.2d 484, 493 (D.C. 1986) (per curiam). Here, the trial judge did not credit certain allegations made by Mr. Resper at the pretrial hearing. Instead, the judge said unequivocally, "this court did not and does not credit [Mr. Resper's] testimony at any point where it was at variance with that of Detective Reed on any material issue." Because the record includes substantial evidence to support the trial court's factual findings, we cannot conclude that they are clearly erroneous; therefore we owe them deference. *See Morris, supra,* 728 A.2d at 1215.

■ The court's legal conclusions followed rationally from its factual findings. Mr. Resper was not formally arrested on March 15th and knew that he had not been placed under arrest. Nor would a reasonable person in his situation have understood that he was under arrest. *See Berkemer, supra,* 468 U.S. at 442, 104 S.Ct. 3138. In effect, Mr. Resper would have us conclude that he had no choice but to "agree" to go to the station. We are not persuaded. The trial court neither credited Mr. Resper's claim that Detective Reed actually threatened him with arrest if he did not submit to an interview, nor his assertion that he was handcuffed from the time that his car was stopped until the interview at the station ended. The record shows that Mr. Resper knew that he had been stopped because of his car. He

voluntarily went to Detective Reed's office without bodily restraints, and agreed to speak with Detective Reed. After the interview, Mr. Resper left Detective Reed's office.[10] Under the circumstances, no reasonable person, knowing as Mr. Resper did that he was not under arrest, would have thought that he was being detained for interrogation against his will. In short, the trial court did not err in concluding that Mr. Resper was not subjected to custodial interrogation, and thus, the administration of *Miranda* warnings was not required.

Mr. Resper also argues that his seizure on March 15th took place in violation of the Fourth Amendment and, consequently, his subsequent statements must be suppressed as "fruits of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He alleges that the trial court could not have found that he was exposed merely to a brief investigative detention followed by his voluntary submission to a police interview. Our standard of review for resolving this issue is effectively the same as for the denial of a motion based on *Miranda. See Womack v. United States,* 673 A.2d 603, 607 (D.C.1996), *cert. denied,* 519 U.S. 1156, 117 S.Ct. 1097, 137 L.Ed.2d 229 (1997).

■ We conclude that the trial court did not err in finding that the police executed a permissible *Terry* stop. As we have previously observed, "[t]he measure of the scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances." *In re M.E.B.,* 638 A.2d 1123, 1127 (D.C.1993) (citing *United States v. Sharpe,* 470 U.S. 675, 682, 105

**10.** The record shows that the police did not have probable cause to arrest Mr. Resper until May 20, 1994, when an eyewitness to the shooting was interviewed; a warrant for Mr.

Resper's arrest was not signed until July 5, 1994; and he was not actually arrested until January 1996.

S.Ct. 1568, 84 L.Ed.2d 605 (1985)), *cert. denied,* 513 U.S. 883, 115 S.Ct. 221 (1994). "The cases uniformly hold that the officers' safety is a significant factor to be weighed in determining whether the restraint chosen by the officers converts that stop to an arrest." *Id.* Given the way in which Mr. Turner was murdered, it was not unreasonable for the police to proceed with great caution once they found and stopped the car associated with the killing. As the trial court found, their precautions did not transform this stop into an arrest.

We understand Mr. Resper to argue, in addition, that he was arrested within the meaning of the Fourth Amendment because he was seized for subsequent custodial interrogation. Mr. Resper relies on *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), to show that his seizure must be viewed as an arrest. Such an arrest would have violated the Fourth Amendment if, as appellant asserts, the police lacked probable cause to arrest him. It is not necessary for us to address the probable cause issue, however, because *Dunaway* is not controlling under these facts. In *Dunaway,* police officers went to a neighbor's home to pick up a murder suspect and take him to the police station for interrogation. *Id.* at 203, 99 S.Ct. 2248. The underlying premise of the Supreme Court's analysis was that the seizure occurred when the appellant was taken to the police station against his will. *Id.* at 207, 99 S.Ct. 2248 ("There can be little doubt that petitioner was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station" (footnote omitted)). Here, Mr. Resper went to Detective Reed's office voluntarily, and as he was told clearly, the officers' immediate purpose in making the stop was to investigate the car's role in the murder. He was not arrested at that time and left Detective Reed's office "without hindrance." *See Oregon v. Mathiason,* 429

U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Consequently, the trial court did not err in viewing the stop as permissible, and concluding that Mr. Resper consented to participate in the police interview.

We turn next to Mr. Resper's evidentiary argument that he was improperly precluded from presenting evidence that other persons had a motive to kill Mr. Turner. During its opening statement at trial, the defense indicated that it wanted to tell the "whole story" behind the murder by presenting evidence about, for example, how Mr. Turner earned a living and "why [he was] in that area [that day]." Immediately after the jury was excused, the prosecution objected. It conceded Mr. Turner "has a little bit of a wild background" but argued that evidence about "any drugs or any other various activity" would not be relevant in this trial. Mr. Resper responded that he was

> entitled to bring out somewhat, others that had a motive.... Basically, what it is about Mr. Turner is that there were many people that were feuding with Everett Turner. And that's because he allegedly killed at least three people, two in Maryland, one in Edgewood in '93 in a hallway and then another fourth on New York Avenue in '91 and '92. And had robbed people constantly.

> What it is basically is Mr. Turner ... was a predator. And there were many people that didn't like Mr. Turner. And I think it's relevant to bring out through Ms. Harley and even his mother, what Mr. Turner did for a living....

> I don't want to give away the defense. But ... if they're truthful, [at least] Ms. Harley will [say that Mr. Turner robbed and killed people].

The prosecution argued that such evidence should be excluded because the defense had "to have something more than suppo-

sitions. There's got to be a clear link or a reasonable link." Defense counsel replied that "the *Winfield* case, which is recent, April of '96, from our Court of Appeals, lessens the standard that the defense formerly had ... to meet in proving that another did the murder or did the crime."

In ruling, the trial court stated:

Well, *Winfield* as it appears in 652 Atlantic Reporter 2nd series ... stand[s] for the proposition that before the defendant may present evidence that someone else may have committed the crime, there must be evidence clearly linking that other person or persons to the facts of the crime on trial. The fact that motive of others alone is not sufficient to meet the foundation for the admission. There must be a nexus between the evidence concerning some other possible person and the crime charged....

... [I]t is not surprising that during the course of a person's lifetime there may be other enemies, other than the defendant.

The evidence, which the Court thus far is aware is that some people linked Mr. Resper's car to the scene and Mr. Resper to the scene. Other than Mr. Eli Alexander there seems no clear linking of anyone else. And so the Court will preclude the presentation of evidence that others had a motive.

Mr. Resper maintains that the trial court applied the wrong legal standard: the "clearly linked" test from *Winfield v. United States*, 652 A.2d 608 (D.C.1994) ("*Winfield I* "), instead of the "reasonable possibility" test adopted in *Winfield v. United States*, 676 A.2d 1 (D.C.1996) (en banc) ("*Winfield II* "). The appellant argues that the trial court improperly excluded evidence by applying the outdated standard of *Winfield I*. Under the *Winfield II* standard, appellant says, he should

have been able to present evidence that others had a strong motive to kill the victim and, consequently, that there was a "reasonable possibility" that someone else committed the murder. The government argues that the trial court's application of the superceded "clearly linked" standard was of no real consequence because appellant's evidence would have been excluded for the same reason under the correct standard since the defense proffer involved only pure conjecture.

 We agree with the government and hold that the trial court would have been compelled to exclude the evidence. As a general matter, the decision to exclude evidence is a matter for the trial court's discretion. *Gethers v. United States*, 684 A.2d 1266, 1271 (D.C.1996) (referencing *Mitchell v. United States*, 408 A.2d 1213, 1215 (D.C.1979)) (other citations omitted), *cert. denied*, 520 U.S. 1180, 117 S.Ct. 1458 (1997). In this case, however, there was only one possible conclusion under the standard adopted in *Winfield II; cf. Jordan v. United States*, 722 A.2d 1257, 1260 (D.C.1998), *cert. denied*, 526 U.S. 1029, 119 S.Ct. 1276, 143 L.Ed.2d 369 (1999) (holding that remand for a discretionary determination would be unnecessary because the facts would support only one result under the *Winfield II* standard) (referencing *Wright v. United States*, 508 A.2d 915, 920 (D.C.1986)).

 As we explained in *Winfield II*, this issue "arises at the intersection of the defendant's constitutional right to an opportunity to present a complete defense, *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), and the obligation of the trial court preliminarily to determine the relevance of proffered evidence and weigh its probative value against the potential it creates for undue prejudice." *Winfield II, supra*, 676 A.2d

at 2. "The Sixth Amendment guarantees to criminal defendants not only the right to confront and cross-examine witnesses against them, but also 'the right to present evidence that someone else committed the offense for which [he] is on trial.'" *Boykin v. United States*, 738 A.2d 768, 773 (D.C. 1999) (quoting *Elliott v. United States*, 633 A.2d 27, 32 (D.C.1993)) (other citations omitted).

However, "[a] defendant's right to pursue a particular line of cross-examination is circumscribed by general principles of relevance." *Id.* (citing *Winfield II*, *supra*, 676 A.2d at 4; *Jordan*, *supra*, 722 A.2d at 1260). "Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Punch v. United States*, 377 A.2d 1353, 1358 (D.C.1977), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978) (citation omitted). For the purposes of a third-party perpetrator defense, relevant evidence is that which "'tend[s] to indicate some *reasonable possibility* that a person other than the defendant committed the charged offense.'" *Winfield II*, *supra*, 676 A.2d at 5 (quoting *Johnson v. United States*, 552 A.2d 513, 516 (D.C.1989) (emphasis in *Winfield II*)). But "[d]espite the rather inclusive reach of the *Winfield [II]* relevance standard, trial courts should still exclude 'evidence that is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt.'" *Boykin*, *supra*, 738 A.2d at 773 (quoting *Winfield II*, *supra*, 676 A.2d at 5) (citations omitted). [A] mere showing that another person possessed a motive to harm the victim as strong as the defendant's, even stronger, usually will "not [be] sufficient to meet the foundation for admissibility ...

which requires a nexus between the proffered evidence and the charged crime." *Winfield I*, 652 A.2d at 608. "[A] defendant's proffer of evidence that other individuals had even stronger motives to murder the victim than the accused [is] insufficient, *without more*, to establish the [required] link to the offense charged...." *Id.* at 612 (emphasis added). Simple proof of motivation of others to commit the crime ordinarily does not create a "real possibility" that any of them was the perpetrator. It follows from this, as the division recognized, that the trial judge ordinarily may exclude evidence of third-party motivation unattended by proof that the party had the practical opportunity to commit the crime, including at least inferential knowledge of the victim's whereabouts.

*Winfield II*, *supra*, 676 A.2d at 5 (footnote omitted).

Here, Mr. Resper's proffer was rooted in the allegedly widespread ill will against the victim. The language of *Winfield II* makes clear that this is not enough. "If evidence of a third party's involvement in the crime were admissible based solely upon who had a motive or ill will against the victim at the time of its commission, undoubtedly, a defendant could point to many such individuals for a victim who associates with a criminal element." *Id.* at 5 n. 5. By the same token, a defendant may often be able to point to many such persons who imaginably could have had access to the crime scene had they wanted to commit the crime. The fact that others with reason to seek revenge may have been present in a neighboring state, in the District, or, perhaps, even in a nearby neighborhood, does not, without more, satisfy the requirement of "practical opportunity."[11] We think that

11. The defense did make reference to the rea- sons for Mr. Turner's presence in the area

"counsel was merely trying to throw something out there for the jury to speculate about." *Gethers, supra,* 684 A.2d at 1272 (citation omitted).

Accordingly, for the foregoing reasons, we affirm Mr. Resper's convictions for second-degree murder while armed, possession of a firearm during the commission of a crime of violence, and carrying a pistol without a license.

*So ordered.*

that day. Such evidence could indeed have been relevant to the case. The vagueness of defense's preliminary showing, however, did not meet our foundational requirements.