*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-735

FLOYD E. BROOKS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF1-24121-09)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued May 5, 2015                                    Decided June 4, 2015)

*Thomas D. Engle*, with whom *Sharon L. Burka* was on the brief, for appellant.

*John Cummings*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, and *S. Vinet Bryant*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and FARRELL, *Senior Judge*.

FARRELL, *Senior Judge*: A jury found appellant guilty of two counts of armed premeditated murder and related firearms offenses arising from the shooting deaths of brothers Robert and Raymond Williams. Appellant claims error in the

trial court's twofold ruling that allowed the prosecutor (a) to impeach a defense witness, Vernon Parrish, with his prior inconsistent statements to defense counsel and a defense investigator disclosed in appellant's *in limine* motion to admit Parrish's third-party perpetrator testimony under *Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc), and (b) to "complete the impeachment" by a stipulation of the parties that Parrish, contrary to his denials on the stand, had made the inconsistent statements to the defense team.

This procedure, for which neither party cites a reported decision on point, presents troublesome issues that we discuss briefly in Part I, *infra*. But because no objection was made to the trial judge's ruling, our review is for plain error, and, as we explain in Part II, on this record there is no reason to believe that appellant's substantial rights were affected by the challenged procedure. We therefore affirm.

**I.**

**A.**

The prosecution's theory was that appellant shot Robert Williams to death on the street out of anger after Williams "disrepect[ed]" him in public by accusing

him of selling drugs, and killed Raymond Williams simultaneously to prevent reprisal or eliminate an eyewitness. Several government witnesses incriminated appellant, and we summarize their testimony later. Our present focus is on what transpired after Vernon Parrish's testimony for the defense was ruled admissible before trial under *Winfield*, and Parrish testified that he had seen an unknown man who was not appellant get out of a car holding a handgun and fire multiple shots at the Williams brothers.

In keeping with the *Winfield* decision,[1] appellant's *in limine* motion to admit testimony, while not naming Parrish, proffered in detail his expected testimony that a man "who did not in any manner resemble" appellant had shot the two victims. After Parrish finished his direct examination, the prosecutor received permission to cross-examine him about details in the proffer that differed from his testimony. In that questioning, Parrish repeatedly denied having told "Mr. Kiersh [defense

---

[1] In *Winfield* the en banc court reaffirmed that "there is only one standard of relevance" in criminal cases, which governs "the admissibility of third-party perpetrator evidence" in the same way it applies to other proffered evidence. 676 A.2d at 3. To present a third-party perpetrator defense, a defendant must proffer evidence that will "tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Id*. at 4 (citation and internal quotation marks omitted). The court further instructed that "the issue of whether third-party perpetrator evidence will be admitted should normally be resolved as a preliminary matter before trial." *Id*. at 6 n.6

counsel] and [his] investigator" specific things about the shooting and his own actions at the time. The judge then left it to the parties overnight to discuss "the best way to complete the impeachment," stating that "[t]o the extent there was a statement made in a meeting with you, Mr. Kiersh, that is inconsistent with trial testimony one way or another, the government is entitled to complete the impeachment." The prosecutor and defense counsel ultimately agreed to a detailed stipulation read to the jury confirming that Parrish had been "interviewed by defense counsel Steven Kiersh and defense investigator Dale Vaughn" and had provided the information stated in the *Winfield* proffer.

## B.

The government contends that this procedure was an ordinary example of the practice by which a party, including a prosecutor, may (a) properly cross-examine a witness with extrinsic evidence so long as there is a factual predicate for the questions "grounded in a good faith belief that the facts are susceptible to proof by competent evidence," *Ali v. United States*, 520 A.2d 306, 313 (D.C. 1987), then (b) introduce the extrinsic proof (here inconsistent statements) after the witness

"answer[s the hostile] questions in the negative," *Grayton v. United States*, 745 A.2d 274, 283 (D.C. 2000).

Particularly as to the latter part of this procedure, it is not at all clear to us that the government is correct. Even as to the cross-examination of Parrish with his prior statements disclosed for *Winfield* purposes, the government concedes that these did not qualify as "reverse *Jencks*" statements made admissible by Super. Ct. Crim. R. 26.2; and what authorities it does cite qualify at best as "*cf.*". For instance, *United States v. Nobles*, 422 U.S. 225 (1975), serves more to identify the problem than furnish an answer aiding the government's position. In *Nobles* the Supreme Court highlighted the importance of the attorney work-product doctrine to "the proper functioning of the criminal justice system," in particular the shelter it provides for "material prepared by agents for the attorney as well as those prepared by the attorney himself," *id.* at 238-39, including "interviews [and] statements" "assemble[d]" by defense counsel "in anticipation of litigation." *Id.* at 237-38 (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)). At the same time, the work-product privilege is a "qualified" one and "may be waived," and in *Nobles*, where the issue was whether the prosecutor could use remaining parts of the defense investigator's report summarizing witness interviews, the defense had

waived the privilege by first "present[ing] the investigator [at trial] as a witness" to impeach government witnesses with their out-of-court statements. *Id*. at 239. By resisting jury exposure to the investigator's complete report, the defense had tried "to sustain a unilateral testimonial use of work-product materials," which the Supreme Court would not permit. *Id*.

It is debatable, surely, whether a defendant's disclosure of witness statements to the *court* to obtain a ruling on admissibility — disclosure responsive to the trial court's "authority to *require* disclosure of a prospective *Winfield* defense in time to permit a ruling on it," *Jordan v. United States*, 722 A.2d 1257, 1262 (D.C. 1998) (emphasis added) — is akin to defense "testimonial use" of its work-product before the jury, such that "waiver" analysis applies equally to the one as to the other. Appellant's "*intent* to use [the *Winfield*] evidence at trial," which the government stresses, Br. for Appellee at 26 (emphasis added), is a weak equivalent of the actual use of the statements by the defense in *Nobles*.

Nor is it obvious how the alibi-notice provisions of Super. Ct. Crim. R. 12.1 help the government's argument. That rule of pretrial discovery balances the work-product protections of Rule 16 (b)(2) ("[T]his paragraph does not authorize

the discovery . . . of . . . statements made by . . . defense witnesses . . . to the . . . defendant's agents or attorneys.") against the government's valid interest in "protecting itself against an eleventh-hour [alibi] defense." *Williams v. Florida*, 399 U.S. 78, 81 (1970). The rule does so by requiring the defendant, in "a limited form of pretrial discovery" that is "carefully hedged with reciprocal duties," *id*. at 80, 81, to disclose where he "claims to have been at the time of the alleged offense and the names and addresses of the . . . witnesses upon whom the defendant intends to rely to establish such alibi." Super. Ct. Crim. R. 12.1 (a). It is not clear to us how that limited (and reciprocal) discovery right justified the broader use at trial here of defense work-product — statements made by defense witnesses "to the . . . defendant's agents or attorney[]," Rule 16 (b)(2) — that the defense had disclosed only to obtain a ruling on whether Parrish could testify. Allowing the prosecution to appropriate these fruits of defense counsel's work, and enabling the prosecution to gather its own impeaching evidence, Rule 12.1, are very different things.

Even more fraught with difficulty, however, is the second part of the process followed here. Parrish's denial of having made particular pretrial statements opened the door, the government asserts, to a compelled stipulation in lieu of

testimony by defense counsel that what the witness had told the defense team contradicted his trial testimony including those denials. It is not easy to imagine a clearer instance of pitting defense counsel's credibility as an officer of the court against his client's own defense and interests. At oral argument government counsel was candid in admitting that were similar impeachment undertaken in the future based on past statements of a witness to defense counsel, the prosecution might have to accept the witness's denials without the opportunity to enlist defense counsel, as here, to dispute his client's version of events.

Nevertheless, for the reasons stated in Part II we need not decide whether, or what part of, the impeachment process allowed here was error. It is enough for us to advise the government to think hard before pursuing again what, at the least, is a dangerous application of the broad rule it invokes allowing witness impeachment with extrinsic evidence. The *in limine* proffer *Winfield* calls for is a valuable tool of felony trial efficiency, but the use made of it here cannot be shrugged off.

## II.

Appellant did not object below to the impeachment he now challenges, or to the ruling letting the government "complete" it by stipulation. "[O]bjections must be made with reasonable specificity," "the trial judge must be fairly apprised as to the question on which [s]he is being asked to rule," and "points not asserted with sufficient precision to indicate distinctly the [objecting] party's thesis . . . will normally be spurned on appeal." *Comford v. United States*, 947 A.2d 1181, 1186 (D.C. 2008) (citation and internal quotation marks omitted). Appellant's counsel agreed with the trial judge that his *Winfield* proffer was a "good faith representation of things [Parrish had] said" to counsel and his investigator, and agreed further ("That's fine") that if the prosecutor "confront[ed Parrish] with an inconsistency in [the] proffer, . . . it would be appropriate to put her in a position to complete the impeachment." Having acknowledged that "if [Parrish] said something different in court . . . from [what I wrote down in the pleading] . . . the government should be able to put that before the jury," defense counsel joined with the prosecutor in fashioning the stipulation as to what Parrish counsel had told him or his investigator. The objections appellant now makes to this procedure, in sum, were not preserved.

Our review thus is for plain error, and appellant has not met his burden on that issue. *See United States v. Vonn*, 535 U.S. 55, 59 (2002). Assuming without deciding that the permitted impeachment and use of the stipulation were "error," and "clear" or "obvious" error, *United States v. Olano*, 507 U.S. 725, 732-734 (1993), appellant has not shown that the error affected his "substantial rights," Super. Ct. Crim. R. 52 (b), because he has not demonstrated "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez-Benitez*, 542 U.S. 74, 82 (2004) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Parrish's testimony suffered from inconsistencies not just when compared to pretrial statements he had made, but also as between his direct and cross-examination.[2] And the jury learned that three weeks before this trial he had given exculpatory testimony in the murder trial of another defendant from the same neighborhood (Clay Terrace) closely paralleling his testimony here.

---

[2] Thus, he testified at one point that what caught his attention and caused him to turn around was a car's screeching tires, but at another point that it was the sound of gunshots. His testimony varied too as to whether he had seen the unidentified shooter before or after hearing shots fired.

Critical, moreover, is the array of government witnesses who linked appellant to the murders, contrary to Parrish's description of an unknown assailant bearing no resemblance to appellant. Frances Cook, whose daughter Casey was dating appellant at the time, had witnessed appellant's angry reaction before the shootings to the "disrespect[]" or humiliation he received in public from Robert Williams over putative drug dealing, and heard him declare that "I'm going to kill [Williams]," before pulling out a handgun.[3] Soon after the shootings Vera Cook, Casey's sister, saw appellant at Vera's home appearing jittery and jumpy as he held a handgun. She heard him tell Casey that he had shot Robert Williams because Williams insulted him, and was forced to shoot Raymond Williams as well after appellant's confederate Angelo Jones ("Lochi") "froze up" and failed to shoot Raymond, whom he "was supposed to get."[4] As to the actual shootings, Debra McPherson, who knew appellant from seeing him nearly every day, heard gunshots

---

[3] James Black, a brother to the Williams brothers, testified that several days before the murders appellant had told him "that one day somebody is going to sneak up on your brother and kill him but it's not going to be me." Black understood this to refer to Robert Williams, who when told of the remark began wearing a bullet proof vest like the one he was wearing at the time of his murder.

[4] In later telephone calls from jail before trial, appellant greeted as "good news" the fact that Jones had been murdered in the meantime. The witnesses in the Williams murder case had not yet been publicly identified, which suggested to the lead detective (who testified) that appellant knew Jones was a likely witness against him since they had been together at the time of the shootings.

and, as she turned around, saw appellant standing over the bodies of the Williams brothers holding a handgun, after which he left in a car driven by another man. Appellant's own car was found on the scene after the shootings, parked within fifteen feet of Raymond's body.

These witnesses were impeached in different ways, but in the aggregate they related incriminating actions and statements of appellant in marked contrast to the spare testimony of Parrish placing the blame on a stranger. Their testimony formed the vast bulk of the prosecutor's argument to the jury, while the impeachment of Parrish with his prior statements was mentioned in the prosecutor's initial closing, but not his rebuttal, as part of a broad attack on the weakness of Parrish's story and appellant's alibi defense. On this record, all told, we cannot say that "the probability of a different result [if the claimed error had not taken place] is 'sufficient to undermine confidence in the outcome' of the proceeding." *Dominguez-Benitez, supra*, 542 U.S. at 83 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

*Affirmed*.