*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CO-827

EILEY S. JORDAN, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(FEL-12121-93)

(Hon. Harold L. Cushenberry, Jr., Motions Judge)

(Argued February 28, 2019　　　　　　　　Decided　August 27, 2020)

*Fleming Terrell*, Public Defender Service, with whom *Samia Fam* and *Mikel-Meredith Weidman*, Public Defender Service, were on the brief, for appellant.

*James A. Ewing*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Vivian E. Kim*, and *Candice C. Wong*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, EASTERLY, *Associate Judge*, and WASHINGTON, *Senior Judge*.

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Opinion by *Associate Judge* EASTERLY, concurring in the judgment, at page 41.

BLACKBURNE-RIGSBY, *Chief Judge*: On June 25, 1999, the trial court sentenced appellant Eiley S. Jordan to twenty years' to life imprisonment for first-degree felony murder related to a June 10, 1992, shooting death. Sixteen years later, the government moved to increase appellant's sentence to thirty years' to life imprisonment, arguing that the trial court's 1999 sentencing was in error because the effective law at the time of the charged offense had raised the statutory minimum penalty for first-degree murder from twenty to thirty years. The trial court granted the government's motion in April 2016, rejecting appellant's challenges to the sentence increase under the Double Jeopardy Clause and the Due Process Clause of the Fifth Amendment of the United States Constitution. On March 23, 2020, we issued an order vacating the trial court's order and remanding for it to reinstate the June 25, 1999, sentencing order. This opinion explains why.

We now hold, for the first time, that a belated correction of a defendant's sentence, even an illegal one, may violate the Due Process Clause. Such a violation, however, only occurs in extreme circumstances, such as those present here, and we use this opportunity to clarify those circumstances. Therefore, we conclude that the trial court's decision to increase appellant's sentence – seventeen years after his sentence had been finalized – violated his rights under the Due Process Clause and must be reversed.

## I. Factual Background

In July 1995, a jury convicted appellant of two counts of first-degree felony murder while armed, along with other related crimes, arising from the June 10, 1992, shooting death of Araminta Coates.[1] For the two counts of first-degree felony murder while armed, the trial court initially sentenced appellant to thirty years' to life imprisonment, each with a mandatory-minimum sentence of thirty years, to run concurrently.[2] On appeal, this court affirmed appellant's convictions, along with those of his co-defendants Tyrone Walker and Donnell Reed, and remanded for the

---

[1] In addition to the two felony murder charges, appellant was convicted of conspiracy to commit murder, first-degree burglary while armed, assault with intent to kill while armed ("AWIKWA"), and two counts of possession of a firearm during the commission of a crime of violence ("PFCV"). *See* D.C. Code §§ 22-2401, -3202 (1993) (first-degree felony murder while armed), recodified at D.C. Code §§ 22-2101, -4502 (2012 Repl. & 2020 Supp.); D.C. Code §§ 22-2401, -3202 (1993) (conspiracy to commit murder), recodified at D.C. Code §§ 22-2101, -1805a (2012 Repl. & 2020 Supp.); D.C. Code §§ 22-1801(a), -3202 (1993) (first-degree burglary while armed), recodified at D.C. Code §§ 22-801, -4502 (2012 Repl. & 2020 Supp.); D.C. Code §§ 22-501, -3202 (1993) (AWIKWA), recodified at D.C. Code §§ 22-401, -4502 (2012 Repl. & 2020 Supp.); and D.C. Code § 22-3204(b) (1993) (PFCV), recodified at D.C. Code § 22-4504(b) (2012 Repl. & 2020 Supp.). Appellant was charged with two counts of first-degree felony murder because Ms. Coates' death occurred while he committed two other felony offenses: first-degree burglary while armed and AWIKWA.

[2] Appellant was sentenced as follows for his remaining counts: twenty to sixty months for conspiracy; fifteen years' to life for armed burglary; fifteen years' to life for AWIKWA; and five to fifteen years for PFCV. The first-degree felony murder sentences and the armed burglary sentence were to run concurrently with each other, but consecutively to the other counts.

merger of several convictions. *See Jordan v. United* States, 722 A.2d 1257, 1262 (D.C. 1998). On remand, we instructed:

> In the process [of merging the convictions], the judge should consider, perhaps on separate motion filed under Super. Ct. Crim. R. 35(a), the claim adverted to by [co-appellant] Walker in his *pro se* motion alleging ineffective assistance of counsel . . . that his mandatory 30-year minimum prison sentence for first-degree murder ran afoul of the prohibition against *ex post facto* punishment (a claim, we note, that is also available to appellant Jordan).

*Id.*

On June 24, 1999, appellant filed a motion under Super. Ct. Crim. R. 35(a) to correct his sentence, advancing the *ex post facto* claim. Appellant argued that the First Degree Murder Amendment Act of 1992, D.C. Law 9-153, 39 D.C. Reg. 3868 (Sept. 26, 1992), which increased the mandatory minimum for first-degree murder from twenty to thirty years, did not take effect until September 26, 1992, fourteen weeks after the charged offense. At a hearing on June 25, 1999, the trial court granted appellant's motion and resentenced him to twenty years' to life on the first-degree felony murder charges, *nunc pro tunc* to his original 1995 sentencing date,

and merged several other convictions.[3]   The government did not file a written opposition to appellant's motion, seek reconsideration of the revised sentence, or appeal.[4]   As a result, the trial court imposed an aggregate amended sentence of twenty-six years and eight months' to life imprisonment, meaning appellant would become eligible for parole on February 11, 2020.

Sixteen years later, on July 14, 2015, the government filed a Rule 35(a) motion to correct appellant's sentence, arguing that the originally imposed thirty-year mandatory-minimum sentence was correct and that the trial court's 1999 resentencing was in error.  The government argued that the First Degree Murder Emergency Act of 1992 –  which became effective for ninety days on April 24, 1992, and raised the statutory minimum penalty for first-degree murder from twenty to thirty years – was applicable at the time of the June 10 charged offense.  *See* First Degree Murder Emergency Act of 1992, D.C. Council, Act 9-200 (April 24, 1992) (the "Emergency Act") (temporarily raising the statutory minimum penalty until the permanent act took effect).  Apparently, the government had been unaware of the

---

[3]  Appellant's sentences for his PFCV and conspiracy convictions remained unchanged.

[4]  The government was unable to ascertain the position it took at the June 25, 1999, resentencing.

Emergency Act until it had been raised in the unrelated case of *Mackall v. United States*, No. 14-CO-1121, Order & J. (D.C. Oct. 30, 2015).

In *Mackall*, defendant Gilbert Mackall claimed a violation of the Equal Protection Clause because the trial court sentenced him to thirty years' to life imprisonment for a murder committed on May 21, 1992, also within the effective period of the Emergency Act, while appellant and co-defendant Walker only received a sentence of twenty years' to life.[5]  *Id.*  In its motion for summary affirmance before this court in *Mackall*, the government recognized this discrepancy in sentencing, acknowledged the Emergency Act's April 24, 1992, effective date, and noted error in appellant's 1999 resentencing.  *See* Gov't's Mot. Summ. Affirmance, *Mackall v. United States*, No. 14-CO-1121 (filed May 20, 2015) ("*Mackall* Gov't Brief").  It was only after the government moved for summary affirmance in *Mackall* in this court that the government also moved to have the trial

---

[5]  Mackall filed several *pro se* motions with the trial court, arguing that his thirty-year sentence was too high because the offense occurred prior to the effective date of the First Degree Murder Amendment Act.  As early as July 29, 2004, the trial court rejected Mackall's claims by relying on the Emergency Act's effective date of April 24, 1992.  In August 2014, Mackall specifically argued that the trial court had sentenced him and appellant differently, a claim that ultimately reached this court. *See generally Mackall*, No. 14-CO-1121, Order & J.  While neither party clarifies how Mackall became aware of appellant's sentence, the government notes they were incarcerated together for a time following their convictions.

court increase appellant's sentence pursuant to the Emergency Act. Appellant opposed the government's motion in the trial court, claiming that an increase in his sentence would violate both the Double Jeopardy Clause and the Due Process Clause of the U.S. Constitution.[6]

The trial court held a hearing and granted the government's Rule 35(a) motion by written order on April 15, 2016 – then almost seventeen years after appellant's 1999 resentencing.[7] The trial court concluded that appellant's downward resentencing in 1999 was illegal because the Emergency Act, which raised the mandatory-minimum sentence for first-degree murder to thirty years' to life imprisonment, became effective on April 24, 1992, and therefore was in effect at the time of the charged offense on June 10, 1992. The trial court was unpersuaded by appellant's arguments that increasing his sentence would violate his rights under the Double Jeopardy Clause and the Due Process Clause. Although it considered the

---

[6] For the same reasons, the government moved to correct the sentence of co-defendant Walker, who joined in appellant's opposition before the trial court. Walker, however, is not a party to this appeal. Co-defendant Reed died on or about March 14, 1999, and the trial court dismissed Reed's case on suggestion of death on April 28, 1999.

[7] The government moved to increase appellant's sentence on July 14, 2015, almost sixteen years after the June 25, 1999, resentencing. The trial court granted the government's motion almost one year later on April 15, 2016, almost seventeen years after appellant's 1999 resentencing.

"much more persuasive legal argument under the Due Process Clause," the trial court was unconvinced that the "extremely long" seventeen-year delay in resentencing violated the Constitution because appellant's circumstances did not present the most "egregious type[] of case[]" that would amount to a due process violation. However, because it found that granting the government's motion would "substantially increase[]" appellant's sentence, the trial court ran his sentences concurrently in order to "mitigate[]" prejudice, resulting in what it calculated as an overall increase of three years and four months before appellant would be eligible for parole consideration. Ultimately, appellant would become eligible for parole on December 31, 2023 (compared to his prior parole eligibility date of February 11, 2020).[8]

On August 2, 2016, the trial court issued a second amended Judgment and Commitment Order, effectuating its April 15 order. This appeal followed.

---

[8] The government calculated appellant's new parole date as a result of its 2015 motion to be December 31, 2023, amounting to a sentence increase of over three years and ten months (six months longer than originally anticipated). Apparently as a result of the increased sentence, appellant lost 200 days of statutory good time credit because such credit cannot be applied to a thirty-year mandatory-minimum sentence.

## II.    Legal Framework

We conclude that, in certain circumstances, a defendant's expectation of finality in a sentence has crystalized such that a later, upward revision to that sentence violates the fundamental right of fairness embodied in the Due Process Clause.  Our analysis of substantive due process reveals that this right is deeply rooted in our history and tradition, such that courts have amply identified this fundamental right and provided guideposts that enable us to carefully describe it.

### A.    The General Rule:  No Expectation of Finality in Illegal Sentences

We acknowledge that the Constitution contains no general prohibition against increasing a sentence when a court finds that it is illegal and that a higher sentence is required by law.  We have upheld such sentence increases in the face of constitutional and other challenges.  *See, e.g.*, *Davis v. Moore*, 772 A.2d 204, 219-21 (D.C. 2001) (en banc) (affirming loss of good time credit, and therefore increase in sentence, in face of *ex post facto* and due process challenges); *Gray v. United States*, 585 A.2d 164, 166 (D.C. 1991) (affirming trial court's increase to sentence

because originally-imposed sentence "was obviously illegal"); *Lindsay v. United States*, 520 A.2d 1059, 1063 (D.C. 1987) (affirming increase in sentence, concluding that an illegal sentence "created no vested rights protected by the double jeopardy clause"); *Christopher v. United States*, 415 A.2d 803, 804-05 (D.C. 1980) (per curiam) (concluding that resentencing did not violate double jeopardy because original sentence was illegal). Moreover, Rule 35(a) permits the trial court to "correct an illegal sentence at any time," and we have long held that the trial court is authorized to bring an illegal sentence into conformity with the law. *See (Derron) Smith v. United States*, 984 A.2d 196, 199 (D.C. 2009); *Phenis v. United States*, 909 A.2d 138, 162 (D.C. 2006); *(Calvin) Smith v. United States*, 687 A.2d 581, 583 (D.C. 1996); *Prince v. United States*, 432 A.2d 720, 721-22 (D.C. 1981) (per curiam). Indeed, this court has stated that "an illegal sentence is a nullity," which the trial court may correct. *Christopher*, 415 A.2d at 804; *see also Bozza v. United States*, 330 U.S. 160, 167 (1947) (holding that correction of an illegal sentence "only set[s] aside what [the sentencing court] had no authority to do, and substitute[s] directions required by the law to be done upon the conviction of the offender" (internal quotation marks and citation omitted)). At first glance, this case may appear to be a straightforward application of these principles, in that the trial court reduced a defendant's sentence and later, in finding the reduction to be unlawful, sought to

reinstate the original sentence. However, what may be true as a general matter may be limited by constitutional imperatives in the exceptional case.

**B.    The Due Process Clause Protects a Defendant's Expectation of Finality in His or Her Sentence**

The Fifth Amendment to the U.S. Constitution guarantees that the government shall not "deprive[]" any person "of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause ensures more than fair process in the deprivation of liberty, however, for it also contains a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997); *see also In re W.M.*, 851 A.2d 431, 447 (D.C. 2004) (citing *Glucksberg*). Thus, substantive due process protects "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720-21 (internal quotation marks and citations omitted). However, the Supreme Court has emphasized that we must "exercise the utmost care" in extending constitutional protection to an asserted substantive due process right, *id.* at 720, and has only sparingly found rights and liberties to be "fundamental" and thus protected by due

process.  *See In re W.M.*, 851 A.2d at 499.  The Court's "established method of substantive due process analysis has two primary features":  a determination of whether the right is "deeply rooted in this Nation's history and tradition," and "a 'careful description' of the asserted fundamental liberty interest."  *Glucksberg*, 521 U.S. at 720 (internal quotation marks and citations omitted).[9]  We conclude that the right to finality in judgment as articulated herein satisfies these features.

A right to finality in judgment is deeply rooted in our history.  In *United States v. DiFrancesco*, the Supreme Court observed that, at English common law, a trial court was permitted to increase a sentence, but only "so long as it took place during the same term of court."  449 U.S. 117, 133-34 (1980); *see also Francis v. United States*, 715 A.2d 894, 898 (D.C. 1998) ("At common law, the sentencing court had plenary authority to increase a sentence at any point during the judicial term within which it had been imposed.").  In explaining the principles of common law

---

[9] In *County of Sacramento v. Lewis,* the Supreme Court articulated the standard for whether executive action amounts to a substantive due process violation:  a court must determine first "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," and, if so, it must then proceed to determine whether the *Glucksberg* features are satisfied.  523 U.S. 833, 847 n.8 (1998).  As discussed below, the decision to increase a defendant's sentence is a judicial, rather than executive, action and we therefore do not utilize the *Lewis* shocks-the-conscience standard.  *See In re W.M.*, 851 A.2d at 449 n.22 (noting that the *Lewis* framework is appropriate for addressing challenges to executive action).  Instead, we proceed directly to the *Glucksberg* analysis.

undergirding the Double Jeopardy Clause of the Fifth Amendment, the Supreme Court acknowledged that "it would seem to be equally difficult to maintain, after what we have said of the inflexible rules of the common law against a person being twice punished for the same offense [under the Double Jeopardy Clause], that such second punishment" would not also violate the Due Process Clause. *Ex parte Lange*, 85 U.S. 163, 170 (1873). Thus, the historical inability of a sentencing court to increase a sentence outside of its term, i.e., after a substantial delay as contemplated here, identifies a deeply rooted tradition of finality in criminal sentencing that presupposes a defendant's expectation of finality in that sentence.[10]

---

[10] As the concurrence notes, it may be that the Double Jeopardy Clause also imposes some limit on a court's ability to correct an illegal sentence. This court, however, has never found a violation of double jeopardy where a court corrects a sentence that, when imposed, was outside its statutory authority. *See, e.g.*, *(Derron) Smith*, 984 A.2d at 199 ("[O]ne cannot have an expectation of finality [protected by the Double Jeopardy Clause] where the court never had jurisdiction to render the sentence."). Similarly, appellant urges us to adopt the holding of the Supreme Judicial Court of Massachusetts in *Commonwealth v. Selavka*, 14 N.E.3d 933, 943 (Mass. 2014) (concluding that a "substantial delay [in a sentence correction] may render even an illegal sentence final for the purposes of double jeopardy analysis"), but we hesitate to do so because that court has "never indicated . . . that an illegal sentence may never become final for the purposes of double jeopardy," *id.* at 944, and our court has said that an illegal sentence "create[s] no vested rights protected by the double jeopardy clause." *Lindsay*, 520 A.2d at 1063 (D.C. 1987).

In light of the facts of this case and this court's precedent, we decline to adopt the analysis in the concurring opinion and, as such, cannot conclude in this case that such a limit exists under the Double Jeopardy Clause.

We are careful to identify the fundamental liberty interest here to the constitutional guarantee of fairness and to describe the interest as a right to finality in sentencing. The "touchstone" of the substantive due process guarantee is the "protection of the individual against arbitrary action of government . . . in the exercise of power without any reasonable justification in the service of a legitimate government objective." *Lewis*, 523 U.S. at 845-46 (citations and internal quotation marks omitted). Thus, "due process . . . stem[s] from our American ideal of fairness." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Among "the rights not enumerated in the Bill of Rights that the Supreme Court has found to be fundamental, and hence entitled to strict judicial scrutiny under substantive due process principles," is the "right to fairness in the criminal process." *In re W.M.*, 851 A.2d at 449 n.23 (citing 2 Ronald D. Rotunda & John E. Nowak, Treatise on Const. L. § 15.7 (3d ed. 1999)).[11] In *Betterman v. Montana*, the Court acknowledged that after a conviction, "a defendant's due process right to liberty, while diminished, is still present." 136 S. Ct. 1609, 1617 (2016). And the Court has acknowledged that a defendant "retains an interest in a sentencing proceeding that is fundamentally fair." *Id.*; *see also North Carolina v. Pearce*, 395 U.S. 711, 724 (1969) (imposing "a penalty upon the defendant for having successfully pursued a statutory right of

---

[11] In a series of case dealing with due process challenges, the Supreme Court has recognized "fairness in the criminal justice system as a fundamental right of each individual." Rotunda & Nowak, 4 Treatise on Const. L. § 18.41 (May 2020 ed.).

appeal or collateral remedy would be . . . a violation of due process of law"). Our recognition of a defendant's right to finality in the post-sentencing phase aligns with his or her fundamental guarantee of fairness in the criminal justice system.

Therefore, while a defendant's due process right to liberty may further diminish post-sentencing, that right is not eliminated and retains some protections under the constitutional due process right to fairness. *See United States v. Lundien*, 769 F.2d 981, 986 (4th Cir. 1985). As the Fourth Circuit stated in *Lundien*:

> Although the parameters of due process to be accorded at sentencing are not firmly fixed, it is beyond doubt that a sentence enhanced, whether before or after commencement of service, because of the vindictiveness or other plainly improper motive of the trial court would be fundamentally unfair and would deny the defendant due process. More important to the instant case, due process may also be denied when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them.

*Id.* at 986-87 (internal citations omitted). While the court in *Lundien* was unwilling to find a constitutional violation where a trial court corrected a defendant's sentence after five days, *id.* at 987, federal appellate courts have recognized the existence of a temporal limit on a court's ability to alter a sentence once imposed and final – even to correct a legal defect. *See Davis v. Sec'y of Corr.*, 266 F. App'x 722, 724 (10th Cir. 2008) (acknowledging that due process may place "some temporal limit on the

power to correct an illegal sentence," but declining to find a due process violation because the trial court resentenced the defendant eight days after the original sentence); *United States v. Davis*, 329 F.3d 1250, 1255 (11th Cir. 2003) ("A defendant's due process rights may be violated when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to finality have crystallized and it would be fundamentally unfair to defeat them." (internal quotation marks and citation omitted)); *Baker v. Barbo*, 177 F.3d 149, 158 (3d Cir. 1999) (noting that the "power of the sentencing court to correct an invalid sentence must be subject to some temporal limit" (internal quotation marks omitted)); *United States v. Mayes*, No. 97-6430, 162 F.3d 1162 (table), 1998 WL 552673, at *4-6 (6th Cir. 1998) (finding due process violation when defendant's sentence was increased five years after initial sentencing); *DeWitt v. Ventetoulo*, 6 F.3d 32, 35 (1st Cir. 1993) ("'[T]he power of a sentencing court to correct upward even a statutorily invalid sentence must be subject to some temporal limit' and . . . in some circumstances such a correction 'might be fundamentally unfair, and thus violative of due process.'") (citation and brackets omitted)); *see also State v. Stern*, 846 A.2d 64, 72 (N.H. 2004) ("Due process thus imposes an outer limit upon the court's ability to correct a sentence after pronouncing it."); *State v. Calmes*, 632 N.W.2d 641, 645 (Minn. 2001) ("[W]e recognize a due process limitation on a court's ability to modify a sentence."); *Austin v. State*, 663 A.2d 62, 64 (Me. 1995) ("[W]e conclude

that, in extreme circumstances, the reinstatement of a discharged sentence, even if discharged illegally, might be fundamentally unfair, and thus violative of due process." (citation and quotation marks omitted)). While it is true that the majority of these courts did not find, under the facts of the particular cases before them, that the upward-revised sentence demonstrated a due process violation, they all recognized that due process protects a defendant's expectation of finality in a sentence in some circumstances.

Following its decision in *Lundien*, the First Circuit held in *DeWitt* that a "later upward revision of a sentence" may be "so unfair that it must be deemed inconsistent with the fundamental notions of fairness embodied in the Due Process Clause." 6 F.3d at 35. The right to finality does not extend to every defendant whose sentence was increased, and it is only the "extreme case," falling beyond a certain temporal limit and under certain circumstances, when the right to finality arises. *Id.* The parameters of the due process right accorded at sentencing are "not firmly fixed," *Lundien*, 769 F.2d at 987, and we appreciate the difficulty in determining when that right has matured. However, courts have provided sufficient guideposts for us to effectively identify those bounds. See *infra* Sections II.C, II.E.

The substantive due process violation articulated here does not merely arise out of an administrative or ministerial sentencing error. *See Wells v. United States*, 802 A.2d 352, 354-55 (D.C. 2002) (finding that appellant's re-incarceration following erroneous release from confinement through administrative error did not qualify as "extreme circumstances" justifying a finding of a due process violation). On this basis, we distinguish *Hawkins v. Freeman*, 195 F.3d 732 (4th Cir. 1999) (en banc), in which the Fourth Circuit refused to find a substantive due process violation when the defendant was mistakenly granted parole and re-incarcerated twenty months later. In *Hawkins*, the Fourth Circuit found that the "administrative error that occasioned the challenged decision here is one too frequently made in penal systems administration" to meet the threshold "shocks-the-conscience" standard of *Lewis*. *Id.* at 744. This court has recognized that a defendant's "expectations and reliance interests in sentence mistake cases are ordinarily trumped by the strong public interest in crime prevention and punishing criminals." *Wells*, 802 A.2d at 354 (quoting *Davis*, 772 A.2d at 220). Thus, our jurisprudence accepts the underlying rationale of *Hawkins*, that an administrative or ministerial mistake alone is insufficient to justify a finding of a due process violation, but it also acknowledges that this general rule may be overcome in certain circumstances. *Id.* at 355. While we do not reject entirely the notion that a substantive due process right may arise under such circumstances, we need not reach that issue here. *See Davis*, 772 A.2d

at 219 ("An expectation of early release from prison (or from service of a sentence) that is induced . . . by the mistaken representations of officials does not without more given rise to a liberty interested entitled to protection under the Due Process Clause.").

We conclude that the right to finality in sentencing is deeply rooted in our history, such that the Due Process Clause protects a defendant's expectation of finality in his or her sentence, even an illegal one, in certain circumstances. Therefore, a later, upward revision to a defendant's sentence may constitute a substantive due process violation.

## C.     Identifying Guideposts:  The *DeWitt* Factors

The First Circuit in *DeWitt v. Ventetoulo* defined the contours of a due process right to finality in sentencing, an analysis we find particularly helpful in formulating our standard.  In 1978, a Rhode Island trial court sentenced Fred DeWitt to life imprisonment with the possibility of parole after ten years.  *DeWitt*, 6 F.3d at 33.  In 1981, the trial court suspended all but fifteen years of his life sentence in recognition of his assistance in another prosecution.  *Id.*  Two years later, the Rhode Island Supreme Court held in *State v. O'Rourke*, 463 A.2d 1328 (R.I. 1983), that state law unambiguously deprived a trial court of the authority to suspend a defendant's

sentence once he or she had begun serving it (notwithstanding the fact that, previously, sentencing judges had incorrectly assumed such authority existed). *DeWitt*, 6 F.3d at 33 & n.2. Despite the high court's clarification that such suspensions were not permitted, the state made no effort to undo the partial suspension of DeWitt's sentence. *Id*. at 33. Meanwhile, DeWitt continued serving his partially-suspended sentence, pursued education and training courses in prison, and was granted parole and released in January 1987 – sixteen months before he would have been eligible for parole under his original life sentence. *Id.* He then obtained work and resumed relationships with family and friends. *Id.* In September 1987, the state began criminal proceedings against DeWitt in another matter and sought to re-imprison him. *Id.* Rather than revoke his parole for violating good behavior conditions, the trial court revoked its 1981 order partially suspending DeWitt's life sentence, finding the original suspension to be improper under *O'Rourke*. *Id*.

The First Circuit concluded that the trial court's correction was so unfair as to violate the Due Process Clause.[12] *Id*. at 36. The court held that "due process must impose some outer limit on the power to revise sentences upward after the fact." *Id.*

---

[12] DeWitt filed a writ of habeas corpus in federal court, which the district court granted and the First Circuit affirmed. *DeWitt*, 6 F.3d at 32.

at 34. Noting that a "convicted defendant does not automatically acquire a vested interest in a mistakenly low sentence," the court recognized that, in an "extreme case," a "later upward revision of a sentence, made to correct an earlier mistake," can be "so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause." *Id.* at 35. Acknowledging that there is "no single touchstone . . . nor any multi-part formula," the First Circuit drew attention to the following non-exclusive factors as probative in determining whether there was a due process violation: (1) "the lapse of time between the mistake and the attempted increase in sentence," (2) "whether or not the defendant contributed to the mistake and the reasonableness of his intervening expectations," (3) "the prejudice worked by a later change," and (4) "the diligence exercised by the state in seeking the change." *Id.*

Analyzing these factors, the First Circuit determined that DeWitt's case "cross[ed] the line" on the state's ability to correct a sentence. *Id.* at 36. First, the court found that the "process that DeWitt received . . . beg[an] with a remarkable double default by the state" in the six years between his partially-sentence suspension and increased resentence. *Id.* at 35. In those six years, the state missed at least two opportunities to correct appellant's sentence: once when DeWitt's sentence was partially suspended, and then at any time after the *O'Rourke* decision.

The court highlighted the "central and singular" fact that the state, which was represented at the hearing in which DeWitt's sentence was partially suspended, did not seek judicial correction of the trial court's decision through reconsideration or review by a higher court (for instance, through a writ of mandamus). *Id.* & n.4. Second, the court determined that the "lengthy delay and change of circumstances" contributed to whether due process was afforded: after the court suspended his sentence, DeWitt spent years in prison reasonably believing his sentence was reduced, was actually released, and laid down new roots in society. *Id.* Finally, in weighing the reasonableness of DeWitt's expectation of finality, the court also reviewed the state's interest in correcting error. *Id.* Because there was no sign of a wide-scale program to identify and resentence other defendants whose sentences were suspended in violation of *O'Rourke*, it appeared that the state singled DeWitt out to avoid conducting a parole revocation hearing, thus skirting the minimal due process obligations applicable to such a hearing. *Id.* at 35-36. Together, "the combined weight of the elements" – the government's original failure to seek review of the original sentence suspension; its "double default" when it remained silent after such suspensions were declared unlawful; the total six-year lapse before it took action and the resulting change in DeWitt's circumstances; and its limited interest in correcting the sentencing errors – brought DeWitt's case within the "very rare

exception to the general rule that courts can . . . revise sentences upward to correct errors." *Id.* at 36.[13]

## D. This Court's Precedent

Though our decisions have twice acknowledged the due process right articulated in *DeWitt*, this court has not yet explicitly recognized it. *See U.S. Parole Comm'n v. Noble*, 693 A.2d 1084, 1105 (D.C. 1997), *op. adopted*, 711 A.2d 85, 85-86 (D.C. 1998) (en banc); *Davis*, 772 A.2d at 220.[14] In both cases, we acknowledged that, under the facts presented in those cases, due process might prohibit the District from "re[-]incarcerate[ing] former prisoners whose sentences have been deemed

---

[13] The government here makes little effort to challenge the First Circuit's legal analysis, arguing only that *DeWitt* "suggests that the due process right is only implicated once a defendant has been released on parole and then re[-]incarcerated." For the reasons discussed throughout, see *infra* Section III, we reject this characterization of the First Circuit's decision. The government also attempts to distinguish *DeWitt* on its facts, which we find unpersuasive as well. See *id.*

[14] In *Noble*, this court held that a congressional enactment – providing that defendants lose accrued "street time" when their parole is revoked – was not repealed by a 1987 D.C. statute, and that it therefore applied retroactively to defendants in the custody of the D.C. Department of Corrections. *See* 693 A.2d at 1085, 1089-90, 1094. In *Davis*, we re-affirmed the *Noble* decision when prisoners, whose street time was revoked, challenged the revocation, in part, as a violation of due process. *See* 772 A.2d at 208-09, 218-20.

satisfied." *Noble*, 693 A.2d at 1105; *see also Davis*, 772 A.2d at 220 (citing *Noble*).[15]

And, in *Davis*, this court generally held open "the possibility that, under 'extreme' circumstances, a belated correction of a sentence might be 'so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause.'" 772 A.2d at 220 (quoting *DeWitt*, 6 F.3d at 35). We concluded that a belated sentence correction that frustrates a defendant's expectations concerning release from confinement, while regrettable, did not, *without more*, constitute a due process violation because such expectations are "ordinarily trumped by the strong public interest in crime prevention, public safety, and punishing criminals." *Id.* at 219 (citations omitted). We clarified that "[o]nly the most egregious case, involving for example governmental culpability and unusual prejudice to the affected prisoner, would support a substantive due process claim." *Id.* at 220. Hence, our decision in *Davis* left open for another day the question of whether, and under what circumstances, such a substantive due process violation might arise.

### E. The Constitutional Right to Finality in Sentencing

---

[15] When highlighting this potential due process violation in *Noble*, we cited approvingly to *Johnson v. Williford,* 682 F.2d 868, 871-73 (9th Cir. 1982), in which the Ninth Circuit concluded, in part, that due process precluded the government from revoking the parole of a defendant released on parole, when he had been convicted under a statute that prohibited the possibility of parole. *See Noble,* 693 A.2d at 1105.

We now take the determinative step of recognizing the right that we had only alluded to in *Noble* and *Davis*, and which has been expressly adopted by other federal appellate and state high courts. See *supra* Section II.B. We hold that, in certain circumstances, the Due Process Clause imposes an outer temporal limit on the power of a court to revise upward a final sentence, even an illegal sentence.[16] We focus on the fundamental fairness interest that is protected by the Due Process Clause, which is violated when a defendant's sentence is increased so long after it has become final that there is no reasonable justification for the increase, even though the increase may be motivated by a legitimate governmental objective. The existence of such a due process right turns on whether a defendant's expectation in the finality of a sentence has crystalized.

Whether a defendant's expectation of finality has crystalized, and thereby matured into a due process right, is not merely determined by the specific number of years that have elapsed. Rather, whether a defendant is entitled to such protection

---

[16] The language of Rule 35(a) is permissive, authorizing the trial court to correct an illegal sentence at its discretion. *See* Super. Ct. Crim. R. 35(a) ("The court *may* correct an illegal sentence . . . .") (emphasis added); *cf. Neverdon v. District of Columbia*, 468 A.2d 974, 975 (D.C. 1983) (noting trial court's discretion in entertaining motion under Rule 35). Where, as here, a Rule 35(a) motion seeks to increase a sentence, and where that upward revision frustrates a defendant's substantive due process right to finality in sentencing, such motion must be denied.

is determined by balancing case-specific factors. This court has indicated that two such factors may give rise to the right: (1) government culpability, and (2) unusual prejudice, including a substantial delay in moving for the sentence increase and harm beyond frustrated expectations. *See Davis*, 772 A.2d at 219-20; *see also United States v. Campbell*, 985 F. Supp. 158, 160 (D.D.C. 1997) ("One of the most frequently considered factors [by courts] is whether the defendant had served so much of his original sentence that his expectations of finality have crystallized."), *aff'd sub nom. United States v. Harrison*, No. 97-3180, 172 F.3d 921 (table), 1998 WL 704512 (D.C. Cir. 1998). We now explicitly adopt the factors highlighted in *DeWitt*, which in part mirror those identified above, namely: the amount of time between that has elapsed illegally-imposed sentence and the attempted sentence increase, the defendant's contribution to the mistake and reasonable expectations of finality, prejudice, and government diligence. 6 F.3d at 35. Moreover, we hold that an analysis under these factors must also take into account the finality of the sentence itself, i.e., the completion of any direct appeal, as well as judicial actions that may change or clarify the legal framework surrounding the sentence. *See DeWitt*, 6 F.3d at 34-35; *Campbell*, 985 F. Supp. at 160 (noting defendant's "expectation of finality cannot be said to have crystalized" because he "was aware from the very moment of sentencing" that the government intended to challenge it on appeal). And we reiterate that, in utilizing this framework, it will be the rare or extreme case in which

a defendant's expectation of finality has crystalized, such that it attains constitutional protection as to a mistaken, even an illegal, sentence.

In sum, we acknowledge that the Due Process Clause may, in extreme circumstances, impose a temporal limit on the power of a court to increase a sentence, even an illegal one. Whether a defendant's expectation of finality in a sentence has crystalized, and is therefore protected by due process, is dependent upon balancing several non-exclusive factors, specifically:

(1) The amount of time that has elapsed between the imposition of the final, incorrect sentence and the attempted imposition of the increased sentence;

(2) The reasonableness of the defendant's expectations of finality, including the exhaustion of any direct appeal and the defendant's contribution to the mistake;

(3) Whether the government was diligent in seeking the upward increase, taking into account the government's culpability in the mistaken sentence and its contribution to the delay; and

(4) Prejudice resulting from the change, which may include the length of time already served.

No one factor is dispositive, and all must be analyzed and balanced to determine whether a defendant's expectation of finality in his or her sentence has crystalized, such that it is protected by the Due Process Clause.

## III. Discussion

We find this case to present the "extreme circumstances" in which appellant's expectation of finality in his sentence had crystalized such that his substantive due process right was violated when the trial court increased his sentence seventeen years after it was finalized. *See Davis*, 772 A.2d at 220. Appellant argues that it was fundamentally unfair to deprive him of his expectation of finality in his sentence; he asserts that the "extraordinary passage of time," along with the government's "repeated failures" to challenge his illegal sentence, are the kind of extreme circumstances that this court should recognize as resulting in a substantive due process violation. We agree. Because of the unique circumstances of this case, particularly the substantial length of time that had elapsed, the reasonableness of appellant's expectation of finality, the government's failure to act despite its knowledge of the error, and the prejudice to appellant caused by the length of the government's delay, we conclude that appellant's expectation of finality in his sentence had crystalized, such that increasing his sentence violated his rights under the Due Process Clause.[17]

---

[17] Because we find a due process violation, we decline to address the merits of appellant's arguments that increasing his sentence violated the Double Jeopardy Clause (see also *supra* note 9), violated the Eighth Amendment, or constituted error under Rule 35.

First, the amount of time that elapsed between appellant's 1999 resentencing and the government's 2015 motion to increase his sentence here is extraordinary, distinguishing it from almost every other case in which courts stopped short of finding a due process violation. Sixteen years had elapsed when the government moved to increase appellant's sentence, and seventeen years had elapsed by the time the court issued its 2016 order – much longer than the six years found to crystallize the appellant's expectation of finality in *DeWitt*. This temporal gap distinguishes this case from other examples that the government cites in asserting that this case does not represent the extreme circumstances giving rise to a substantive due process violation. *See, e.g.*, *Baker*, 177 F.3d at 158 (two years); *Campbell*, 985 F. Supp. at 159 (eighteen months).

Second, appellant's expectation that his 1999 sentence was final and would remain unchanged was reasonable. The reasonableness of a defendant's expectation that a sentence is final can be evaluated based on whether the defendant exhausted any direct appeal, knew or should have known of the original sentencing error, contributed to the mistaken sentence, or was aware of any subsequent change in the legal framework surrounding such mistake. *See, e.g.*, *DeWitt*, 6 F.3d at 36. Appellant moved to correct his sentence in 1999, following our instruction that he

may have an *ex post facto* claim. The trial court granted his motion on that claim, revising his sentence downward from thirty years' to life to twenty years' to life, and the government made no effort to contest, seek reconsideration, or appeal that decision. Here, it cannot be said that appellant was on notice that his reduced sentence was the result of any error or that the government, after failing to contest the 1999 resentencing, would seek to increase a sentence that it appeared to concede was final. As he had exhausted the judicial process, appellant's 1999 sentence was, by all appearances, final.

Furthermore, appellant's contribution to the mistake was nominal, at best. There is no evidence that appellant knew of the Emergency Act, ignored controlling law when he filed his 1999 motion, or knew or should have known of any error in the trial court's resentencing. While the existence of the Emergency Act that the trial court in 2016 found to be the controlling law in effect at the time of the charged offense was discoverable by appellant in 1999, it was equally discoverable by the government. That the government did not raise the Emergency Act (and seemingly remained ignorant of it until *Mackall*) negates any suggestion that appellant contributed to the mistake. Rather, appellant acted upon this court's suggestion in advancing an *ex post facto* claim. Under these facts, we conclude that appellant's expectation in the finality of his 1999 resentencing was reasonable.

Third, the government cannot be said to have exercised diligence in seeking the change here. The government missed numerous opportunities over sixteen years to correct appellant's sentence, and it admits as much in its brief. In fact, the government was not even aware of any issue until it was raised in *Mackall v. United States*, an unrelated case. The government's conduct here is akin to a *triple* default, further diminishing the government's diligence and increasing its culpability as compared to the "double default" highlighted in *DeWitt*. 6 F.3d at 35. Here, the government (1) did not oppose appellant's request to revise his sentence downward in 1999; (2) took no action after it was put on notice of the Emergency Act, i.e., by at least July 2004, when the trial court cited it in denying Mackall's challenges (see *supra* note 5); and (3) waited almost a year after receiving notice of the illegal sentence in appellant's case – when Mackall expressly cited to appellant's 1999 resentencing in his August 2014 equal protection argument to the trial court, noting differential sentencing under the Emergency Act – before moving to increase appellant's sentence. The government provided no reason for its eleven-year delay (after the Emergency Act issue was first raised by Mackall in 2004) in seeking a correction in appellant's sentence, further compounding its negligence. Moreover, there is no indication that the government's action to increase appellant's sentence is a result of any wide-scale effort to find and correct other illegal sentences (if any)

resulting from the Emergency Act, thus demonstrating minimal (if any) government interest in correcting illegally low sentences. Such conduct undermines any argument that the government was diligent in efforts to increase appellant's sentence.[18]

The government urges us to find that this is not the extreme case that warrants finding a due process violation because appellant's twenty-year to life resentencing in 1999 "was induced, not by governmental misconduct, but rather by appellant's erroneous motion." The government's argument, however, misconstrues the relevant balancing. All sentencing errors arise out of some mistake. Our analysis here only considers the government's diligence in seeking a sentence increase, whoever may have induced the underlying error. Thus, we analyze the government's actions taken in response to appellant's "erroneous" 1999 motion when analyzing

---

[18] In a footnote in its brief, the government claims that it has not singled out appellant and his co-defendant. It notes that it "conducted an analysis of all homicides committed in D.C. between April 24, 1992, and September 26, 1992" and identified eight felony-murder convictions and one potential sentencing error during that time frame. The government, however, does not state that its efforts to increase appellant's sentence arose out of systematic efforts to identify and correct sentencing errors. Rather, it appears to concede that its actions arose only because Mackall raised the issue in his own case. *See Mackall* Gov't Brief at p. 16 n.17 ("The government anticipates moving in the trial court pursuant to Rule 35 to correct the Jordan/Walker defendants' mandatory-minimum murder sentences from 20 to 30 years."). Moreover, the government does not identify any action taken in the five years since filing its Rule 35 motion here to correct other sentencing errors in other cases, even though it acknowledges that at least one such error may exist.

whether appellant's due process rights have been violated. *Cf. Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (noting that, in determining whether a state violated a defendant's right to speedy trial under the Sixth Amendment, the state's "[d]eliberate delay to hamper the defense weighs heavily against the prosecution," while "[m]ore neutral reasons such as negligence or overcrowded courts weigh less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant" (cleaned up)). Appellant's 1999 motion was a product of this court's mention of an *ex post facto* claim on appeal. *See Jordan*, 722 A.2d at 1262. The government did not oppose that motion, did not seek reconsideration or appeal of the trial court's decision granting it, and remained silent for sixteen more years. These facts support, rather than weigh against, the lack of diligence by the government – and, in fact, weigh in favor of the reasonableness of appellant's expectation of finality in his 1999 sentence.

Fourth, appellant has suffered prejudice. For almost sixteen years, appellant anticipated that he would have the opportunity to be considered for release from prison in February 2020. In anticipation of that release, appellant took GED, parenting, and other courses; planned for his employment and living arrangements; and invested emotionally in the prospect of reconnecting with family. Despite this

crystalized expectation of finality, the government filed a motion to increase appellant's sentence by ten years, which the trial court granted. This is strikingly different from other cases in which appellants were aware that their sentences were not final. *See, e.g.*, *United States v. Watkins*, 147 F.3d 1294, 1298 (11th Cir. 1998) (finding that appellant could not have an expectation of finality, in part because he challenged his conviction and sentence); *Campbell*, 985 F. Supp. at 160 (noting that defendant "was aware from the very moment of sentencing" that the government intended to challenge the sentence on appeal); *Calmes*, 632 N.W.2d at 648 ("At the time conditional release was removed from his sentence, Calmes was on notice that a statute required that he serve a conditional release term."). Indeed, the government admitted that its action would prejudice appellant by increasing his sentence by ten years. We are mindful that the trial court attempted to "mitigate[]" the prejudice arising from its grant of the government's Rule 35 motion and the ensuing "substantial[]" ten-year increase to appellant's sentence by concurrently running appellant's sentences for each offense, resulting in an overall increase of three years and four months. Still, despite the trial court's attempt to lessen the increase, appellant would remain imprisoned without any possibility of parole for more than three additional years.

The fact that the sentence was increased by less than it could have been does not, in and of itself, eliminate that prejudice. *See Breest v. Helgemoe*, 579 F.2d 95, 101 (1st Cir. 1978) (acknowledging that a due process right to finality might arise when an illegal sentence is corrected so as to "postpone[] parole eligibility or release date far beyond that originally set"); *cf. Glover v. United States*, 531 U.S. 198, 202-04 (2001) (stating that "any amount of actual jail time has Sixth Amendment significance" and rejecting argument that increase of prison term by "anywhere between 6 and 21 months" was not significant enough to constitute prejudice in an ineffective-assistance-of-counsel claim).

To be clear, we do not hold, as the government believes, that an appellant is entitled to a particular release date or to parole eligibility on a date certain, as there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). However, the government's sixteen-year delay in moving to increase appellant's sentence, which pushed back his parole eligibility date by almost four years, prejudiced appellant in a manner that went "beyond frustrated expectations." *Davis*, 772 A.2d at 217 (citation omitted). The government's delay in seeking to correct an illegally-imposed sentence surpassed the temporal limits of the Due Process Clause's fundamental notions of fairness. *See*

*id.* at 220 (explaining that, under "extreme" circumstances, an offender's reliance on sentencing mistakes may trump "the strong public interest in crime prevention . . . and punishing criminals" (citation omitted)); *DeWitt*, 6 F.3d at 36 ("[D]ue process must in principle impose an outer limit on the ability to correct a sentence after the event.").

We are not persuaded by the government's argument that this is not the type of "extreme" case contemplated by *Davis* and *DeWitt* because, as the government contends, those cases stand for the proposition that a substantive due process violation *only* arises when a defendant is re-incarcerated. We are comfortable finding a due process violation even though appellant's sentence was increased while he was incarcerated because such a due process right does not mature only when an individual is released from prison, i.e., it is not linked only to a defendant's liberty interest upon release from incarceration. Instead, the question is whether so much time has elapsed that a defendant's expectation of finality in his or her sentence (regardless of current incarceration status) has crystalized and that the fundamental right to fairness guaranteed by the Due Process Clause would be violated by increasing that sentence. *See Lundien*, 769 F.2d at 987 ("[D]ue process may . . . be denied when a sentence is enhanced after the defendant has served so much of his

sentence that his expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them.").

While this court has only expressly considered the potential substantive due process violation in the re-incarceration of former prisoners "whose sentences had been deemed satisfied and who had readjusted to society," *Davis*, 772 A.2d at 220, that example was merely inspired by the facts of that particular case and did not constitute the universe of the due process right related to finality of sentencing articulated herein. Rather, as articulated by the First Circuit in *Breest*:

> When a prisoner first commences to serve his sentence, especially if it involves a long prison term as here, the prospect of release on parole or otherwise may seem but a dimly perceived, largely unreal hope. As the months and years pass, however, the date of that prospect must assume a real and psychologically critical importance. The prisoner may be aided in enduring his confinement and coping with the prison regime by the knowledge that with good behavior release on parole or release outright will be achieved on a date certain. After a substantial period of time, therefore, it might be fundamentally unfair, and thus violative of due process for a court to alter even an illegal sentence in a way which frustrates a prisoner's expectations by postponing his parole eligibility or release date far beyond that originally set.

579 F.2d at 101; *see also Baker*, 177 F.3d at 158 ("We realize that prisoners place enormous weight upon their hopes for parole or release."). The First Circuit in

*DeWitt* identified the fact that a defendant may "continue[] for a number of years in prison reasonably believing that his sentence had been reduced" as indicative of a changed circumstance that supports finding a finding of a due process violation. 6 F.3d at 35.

The government also attempts to distinguish *DeWitt* by arguing that – as evidenced by the First Circuit's analysis – "release followed by re-incarceration is by far the most significant factor in determining whether correction of a sentencing mistake gives rise to a due process claim." We find no support for this claim. In *DeWitt*, the First Circuit identified at least three facts that demonstrated a change in circumstances underlying the due process claim: "[(1)] DeWitt not only continued for a number of years in prison reasonably believing that his sentence had been reduced, [(2)] but he was actually released. He remained free from January 1987 to September 1987 and [(3)] laid down new roots in society, acquiring a job and reestablishing family ties" before being re-incarcerated. 6 F.3d at 35. Ultimately, the First Circuit's analysis of the "change of circumstances" (the combination of those three facts) was one factor in the due process analysis and, in and of itself, was "not decisive." *Id.* Instead, the outcome was a "result of the combined weight of the elements." *Id.* at 36. Therefore, we reject the government's claim that this due process right is only violated when a defendant is re-incarcerated, or that such a fact

is dispositive. While it may be true that a defendant's expectation of finality is even more crystalized and therefore protected upon release, such that re-incarceration gives rise to a due process violation, that is not the only "extreme circumstance" warranting relief. Rather, we must analyze the fact-specific circumstances of each case to determine whether a substantially delayed sentence increase violates an appellant's due process right such that it limits a court's ability to alter a sentence after it is final and imposed.

Lastly, we are unpersuaded by the government's juxtaposition of *DeWitt* and *Hawkins* to argue that "courts are split on whether the defendants' due process rights are violated" when they are improperly released and re-incarcerated. In *Hawkins*, the Fourth Circuit rooted its due process analysis in the fact that an administrative error caused the defendant to be mistakenly granted parole. *See* 195 F.3d at 747 ("[T]he precise right asserted is that of a prisoner to remain free on erroneously granted parole so long as he did not contribute to or know of the error and has for an appreciable time remained on good behavior to the point that his expectations for continued freedom from incarceration have 'crystallized.'"). Such facts are not before us, but we fail to see how only re-incarceration as a result of an administrative mistake would implicate a defendant's substantive due process right to finality in sentencing. The due process right articulated herein arises from a defendant's

expectation of finality in a sentence becoming crystalized, regardless of re-incarceration.

To reiterate, in balancing the four factors outlined above, we have no difficulty concluding that this case is one of those "extreme circumstances" that crosses the outer limit on the ability for a trial court to correct an illegal sentence. While no one factor is dispositive, we find the government's sixteen-year delay in challenging appellant's sentence, despite numerous opportunities to do so, to be significant in determining that this is the "rare" and "exceptional" case where appellant's substantive due process rights were violated.

## IV.    Conclusion

Accordingly, as stated in our March 23, 2020, order, we reverse the trial court's 2016 order increasing appellant's sentence, and we remand for the trial court to enter an amended Judgment and Commitment Order that reflects the sentence imposed in 1999.

*So ordered.*

EASTERLY, *Associate Judge*, concurring in the judgment: I agree we must reverse the trial court's 2016 order increasing Mr. Jordan's sentence from twenty years to life to thirty years to life. I would endorse the recognition of a new substantive due process right to fairness in sentencing if I thought such recognition were necessary. But, based on the facts of this case, Mr. Jordan is entitled to relief under the Double Jeopardy Clause of the Fifth Amendment.

The Double Jeopardy Clause has long been understood to protect against both successive prosecutions and successive sentences. *See Ex parte Lange,* 85 U.S. (18 Wall.) 163, 170 (1873). Whether a sentence increase violates the Double Jeopardy Clause "turns on whether a defendant has a legitimate expectation of finality in the sentence." *Smith* (*Calvin*) *v. United States*, 687 A.2d 581, 583 (D.C. 1996). "Typically, a defendant attains a legitimate expectation of finality in a prison sentence when he begins serving it." *Herring v. United States*, 169 A.3d 354, 359 (D.C. 2017) (citing *Smith* (*Calvin*), 687 A.2d at 583). Whether a defendant has a legitimate expectation of finality is an objective inquiry. *Id.*

Here, Mr. Jordan had not just begun to serve his twenty-year-to-life sentence; he had completed sixteen years of that sentence and was approaching his official

parole eligibility date when the trial court granted the government's Super. Ct. Crim. R. 35(a) motion and increased his sentence to thirty years to life.

The government argues that this belated sentence increase did not upset any reasonable expectation of finality Mr. Jordan had in his twenty-year-to-life sentence because that sentence was illegal. As a general matter it is true that, even if a defendant has begun serving a sentence of imprisonment, he cannot develop an expectation of finality in that sentence if it is illegal. *Bozza v. United States*, 330 U.S. 160, 166 (1947). Relatedly, as the government argues, Rule 35(a) authorizes the trial court "to correct an illegal sentence at any time." In Mr. Jordan's case, the court granted the government's Rule 35(a) motion because his twenty-year-to-life sentence was incorrectly low; under the statutory scheme operative at the time of the offense, a thirty-year-to-life sentence was required.

But unlike other cases where we have held that the illegality of a sentence defeats a double jeopardy challenge to its correction, this is not a case where a defendant was given an illegally low sentence at the outset, the error came to the trial court's attention, and the sentence was corrected and increased. *See, e.g.*, *Phenis v. United States*, 909 A.2d 138, 162-63 (D.C. 2006). The twist in this case is that the illegally low sentence the government sought to correct in 2015 via a Rule

35(a) motion was *itself* the product of a prior Rule 35(a) motion that Mr. Jordan filed in 1999. Mr. Jordan was initially, correctly, sentenced to thirty years to life, but because, at this court's suggestion, *ante* at 3-4, he mistakenly thought that sentence had been imposed in violation of the ex post facto clause, he filed a Rule 35(a) motion. At that point the government had the opportunity to argue that Mr. Jordan was not entitled to a sentence reduction. The government did not file an opposition. And although there is no record of the hearing because the transcript has been destroyed, it is undisputed that after the trial court ruled that Mr. Jordan had been given an illegally long sentence, granted his Rule 35(a) motion, and reduced his sentence to what the court understood his legal sentence to be, twenty years to life, the government did nothing. It did not move for reconsideration or appeal the resentencing order to this court; instead, the government allowed the corrected sentence to become Mr. Jordan's final sentence.

It is well established that "arguments not raised in the trial court are ordinarily waived on appeal," *Blackson v. United States*, 979 A.2d 1, 10 n.9 (D.C. 2009), and that this principle of waiver "applies to the government no less than to the defendant." *Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993) (explaining that the principle should be adhered to "even where the waived point might have arguably led to" a ruling in the government's favor, *id.* at 536). It is also well established that

when the government has a right to challenge a sentencing decision on appeal but fails to exercise that right, a defendant acquires an expectation of finality in that sentence. *See United States v. DiFrancesco*, 449 U.S. 117, 136 (1980) (explaining that where the government has a right to appeal, a defendant "has no expectation of finality in his sentence until the appeal is concluded or the time to appeal has expired"); *see also State v. Schall*, 449 N.W.2d 225, 228 (Neb. 1989) (same); *People v. Williams*, 925 N.E.2d 878, 888 (N.Y. 2010) (same); *State v. Christian*, — N.E.3d —, No. 2017-1691, 2020 WL 1146797, at *4 (Ohio Mar. 10, 2020) (same). These principles of forfeiture that give rise to an objective expectation of finality extend even to the government's failure to exercise its right to appeal an illegally low sentence. *See Greenlaw v. United States*, 554 U.S. 237, 252 (2008). In *Greenlaw*, the Supreme Court reversed a sentence increase by an appellate court where the government had failed to cross-appeal, rejecting the argument that the appellate court should be permitted to fix the illegally low sentence because the trial court would be permitted to fix it on remand. *Id.* at 253-54, 254 n.8. The Court explained that the trial court would be "confine[d] . . . [by the] default and forfeiture doctrines" and that it would be "hard to imagine a case in which a district court, after a court of appeals vacated a criminal sentence, could properly increase the sentence based on an error the appeals court left uncorrected because of the cross-appeal rule." *Id.* at 254 n.8.

Applying these principles to this case, the question of what sentence could be legally imposed on Mr. Jordan had been actually and finally litigated without opposition from the government in the 1999 Rule 35(a) proceeding. It was thus objectively reasonable for Mr. Jordan to expect that the "corrected" twenty-year-to-life sentence he received as a result of that proceeding was his legal, final sentence. In other words, the court's express endorsement of this albeit illegal "correction" in 1999, coupled with the government's waiver, induced and legitimized Mr. Jordan's expectation of finality. This expectation was then reinforced by sixteen years of inaction by the government. Thus, in 2015 when the government sought to relitigate the legality of Mr. Jordan's sentence, he was entitled under the Double Jeopardy Clause to protection from any increase of his 1999 sentence.

Our precedent is not an obstacle to such a double jeopardy analysis. First, although our court has previously made broad pronouncements that an "illegal sentence is a nullity," *Christopher v. United States*, 415 A.2d 803, 804 (D.C. 1980), it has never done so in facts akin to those in this case. Moreover, our prior decisions repeating this statement could not have meant it literally. As the Supreme Court explained in *Ex parte Lange*, *all* illegal sentences are not null and void. Only a judgment issued when a court lacks jurisdiction over "the party and of the offence" [*sic*] is void in the sense that "the officer who held the prisoner under it would be

liable, or the prisoner at perfect liberty to assert his freedom by force." 85 U.S. (18 Wall.) at 174. Other judgments, "though erroneous, [are] not absolutely void"; they are merely voidable. *Id*.; *see also id*. at 175 (acknowledging that "[a] judgment may be erroneous and not void"). Where, as here, a trial court has jurisdiction to preside over both the defendant and the case, any illegal sentence of imprisonment the court issues is not, literally, "a nullity." Rather, it has the force and effect of holding the defendant in prison for its duration unless and until it is fixed by a court.[1] And, as

---

[1] This court in *Smith (Derron) v. United States*, 984 A.2d 196 (D.C. 2009), acknowledged both that there is a distinction between illegal and voidable and illegal and void sentences and that a defendant can have an expectation of finality in an illegal and voidable sentence. *See id.* at 199. In *Smith (Derron)*, the trial court had granted a defendant's untimely Rule 35 motion for a sentence reduction and then, based on a misperception that it had lacked jurisdiction to act on the untimely motion, had reversed itself and reinstated the defendant's longer sentence. *Id.* at 198. This court upheld Mr. Smith's double jeopardy claim. *Id.* at 201. We explained that the trial court's understanding that it lacked jurisdiction to grant the defendant's Rule 35 motion was incorrect, since Rule 35 is a claim-processing rule, not a jurisdictional one. *Id.* We elaborated:

> If the judge were correct that under Rule 35(b) the court lacked jurisdiction to reduce the sentence on February 13, double jeopardy would not bar resentencing because Smith would have had no legitimate expectation of finality in the February 13 sentence. *While one can still have an expectation of finality in a sentence predicated upon an erroneous interpretation of the law*, one cannot have an expectation of finality where the court never had jurisdiction to render the sentence.

*Id.* at 199 (emphasis added) (citations omitted).

*Greenlaw* indicates, it can even be left in place by a court if the government forfeits the opportunity to correct it. *See* 554 U.S. at 252–53.

Second, prior decisions of this court rejecting a double jeopardy claim because the sentence that was increased was illegal do not foreclose a double jeopardy analysis in this case. Decisions cited by the government like *Phenis*, 909 A.2d 138, and *Christopher*, 415 A.2d 803, are distinguishable. They all involve a *single effort* to correct an illegal sentence. Thus, they support the proposition that the Double Jeopardy Clause "will not forbid the court to retrace its steps to 'set aside what it had no authority to do.'" *Smith* (*Calvin*), 687 A.2d at 586 (quoting *Bozza,* 330 U.S. at 167).

But the question in Mr. Jordan's case is whether, consistent with the Double Jeopardy Clause, a trial court, having *already* retraced its steps to correct what it believed to be an illegal sentence on an earlier Rule 35(a) motion—and that decision having become final—may years later go back *again* to correct a legal error in the previously "corrected" sentence and increase a defendant's term of incarceration as a result. Neither this court nor any other court to my knowledge has ever said the Double Jeopardy Clause permits that. *Cf. id.* (rejecting the government's argument that the defendant could not have a legitimate expectation of finality in a sentence

that was the product of a reduction pursuant to Rule 35(b) based on a mistake of fact, and explaining that under the government's logic "a defendant could *never* have an expectation of finality in a sentence").

Sentencing should not be "a game in which a wrong move by the judge means immunity for the prisoner." *Bozza*, 330 U.S. at 166–67. But Rule 35(a) proceedings likewise should not be a game. The Double Jeopardy Clause provides the requisite safeguard. It protects a defendant's reasonable expectation of finality in his sentence. A defendant has such a reasonable expectation of finality where, as here, the question of the legality of his sentence is put before the trial court in a Rule 35(a) motion, the court rules that a lower sentence is the legal sentence, the government does not challenge that ruling, and a defendant goes on to serve that sentence to near completion.